COOK, Exr., Appellant,

v.

REISING, Appellee.

[Cite as *Cook v. Reising,* 181 Ohio App.3d 546, 2009-Ohio-1131.]

Court of Appeals of Ohio,
Ninth District, Lorain County.

No. 08CA009417.

Decided March 16, 2009.

Daniel D. Mason and Russell T. McLaughlin, for appellant.

Kim R. Myers, for appellee.

***

CARR, Judge.

{¶ 1} Appellant, Elaine Cook, executor of the estate of Theresa Sullivan, appeals from a judgment of the Lorain County Court of Common Pleas that granted summary judgment to appellee, George Reising. This court reverses and remands.

I

{¶ 2} Theresa Sullivan lived for many years with her sister Margaret in a home in North Ridgeville that had been in their family since the 1880s. By the time Theresa and Margaret were in their 90s and in declining health, they were

assisted by 24–hour caregivers so they could continue to live in their family home. At that time, each woman apparently had sufficient financial means to pay for in-home caregivers. It was understood by their family members that both women wanted to stay in their home as long as they could. After Margaret passed away in October 2001, Sullivan continued to live in the home. Sullivan was blind and had limited mobility and was dependent on others to assist her.

{¶ 3} On March 21, 2001, because the relative who had been acting as her power of attorney had passed away, Sullivan executed a new general durable power attorney that appointed George Reising, her nephew. Sullivan's attorney had contacted several of her relatives, and Reising had agreed to act as her power of attorney. Despite Reising's portrayal to outsiders that he played a major role in caring for his aged aunt, the evidence tended to demonstrate that he did not play a significant role in her day-to-day care. Sullivan's in-home caregivers provided her day-to-day care in the home and did her grocery shopping. Cook brought her medications to the home and dispensed them into pill dispensers to be administered by the caregivers. Even with the power of attorney, Reising was not in charge of Sullivan's finances because all of her bills were paid by a trust at First Merit bank. Reising merely delivered the bills to Kristina King, a trust officer at the bank, who paid the bills with money from the trust. Reising's caregiving role was apparently limited to driving Sullivan to her doctor's appointments. Reising visited Sullivan's home approximately once every week or every two weeks.

{¶ 4} During early 2003, the monthly cost of Sullivan's in-home care was approximately $10,000 to $11,000. Reising and King discussed Sullivan's financial situation during one of Reising's visits to the bank, although it is unclear who initiated the conversation about that topic. King testified that she spoke to Reising about Sullivan's financial situation because he was her power of attorney. She explained to him that because the balance of Sullivan's trust was down to approximately $180,000, she could afford to remain in her home with in-home care for less than 18 months. Reising asked King about Medicaid planning, so she referred him to an attorney, Harold Hom.

{¶ 5} Reising met with Hom and hired him to represent Sullivan. Reising and Hom discussed the possibility of Sullivan's applying for Medicaid due to her financial situation and that she would eventually need to move into a nursing home, which would be half the cost of in-home care. Reising also emphasized that Sullivan's home had been in the family for over a century, so they discussed how to save the home from the government's forcing its sale to pay for Sullivan's care. As Hom later testified, "the main thrust of this whole thing" was to "save the house" and keep it in the family.

{¶ 6} Hom prepared the necessary documents and came to Sullivan's home to obtain her signature on two separate dates. On February 10, 2003, Sullivan signed a new power of attorney that authorized Reising to make gifts of her property. On February 24, 2003, Sullivan signed a quitclaim deed that transferred title of the home to Reising. During each meeting, Reising asked the in-home caretaker to leave, and he met with 92–year–old Sullivan, along with Hom and King. Sullivan could not read the documents because she was blind, and it is unclear what was explained to her before she signed each document.

{¶ 7} Shortly afterward, Sullivan was moved to a nursing home. Reising began cleaning out the house and preparing it for sale. He continued to represent to others that this was all being done to help pay for Sullivan's care and that he was putting the money into a trust for Sullivan and her heirs. It is not clear from the record exactly when the sales occurred, but the sales of Sullivan's personal and real property realized proceeds of approximately $165,000. He sold Sullivan's real and personal property without attempting to keep her property in the family.

{¶ 8} Sullivan passed away on October 24, 2004, at the age of 94. Although Reising bought Sullivan some clothes after he acquired title to her home, he did not expend any additional money on her. It was apparently not until after her death that Cook discovered that Reising had kept the proceeds from the sales of Sullivan's home and personal property for himself and had never placed the money in trust for Sullivan or her estate and had not used the proceeds to help with Sullivan's expenses. The inventory of Sullivan's remaining estate was worth approximately $60,000. Reising, who was not one of the eight beneficiaries in Sullivan's will, had received the bulk of Sullivan's estate, leaving the remaining 17 percent to be divided between the eight heirs named in her will.

{¶ 9} On February 17, 2006, Cook, as executor of Sullivan's estate, filed this action against Reising, alleging that Reising had inappropriately (1) obtained title to Sullivan's home, (2) sold the home and kept the proceeds, and (3) disposed of Sullivan's personal property and kept the proceeds. Cook's complaint stated numerous causes of action, including that Reising had obtained the quitclaim deed by fraud, deceit, or misrepresentation; that he had exerted undue influence over Sullivan in the execution of these documents; that he had breached his fiduciary duty to Sullivan as her attorney in fact; that due to the fraudulent transfer, the property or the proceeds of the real-property sale should be held in constructive trust for Sullivan's estate; and that Reising wrongfully converted items of Sullivan's personal property.

{¶ 10} Reising later moved for summary judgment, contending that there were no genuine issues of material fact and that he was entitled to judgment on all of Cook's claims. Specifically, Reising alleged that there was no evidence that

Sullivan lacked the mental capacity to execute these documents or that he had done anything inappropriate to obtain or dispose of any of her real or personal property. Reising pointed to deposition testimony that he had attached to his motion. Cook responded in opposition, pointing to additional evidence that she filed with the court.

{¶ 11} The trial court granted summary judgment to Reising, explaining that there were no genuine issues of material fact in dispute. Specifically, the trial court noted that Sullivan was no longer alive to explain what had transpired and that two disinterested witnesses, King and Hom, had testified that Sullivan appeared to be competent when she executed the expanded power of attorney and quitclaim deed and that she did not appear to be under any undue influence by Reising.

{¶ 12} Cook appeals and raises one assignment of error.

## II

### *ASSIGNMENT OF ERROR*

The trial court erred to the substantial prejudice of appellant in granting summary judgment.

{¶ 13} Cook maintains that the trial court erred in granting summary judgment because there were genuine issues of material fact on all of the claims she raised. Pursuant to Civ.R. 56(C), summary judgment is proper if:

(1) [N]o genuine issue as to any material fact remains to be litigated; (2) the moving party is entitled to judgment as a matter of law; and (3) it appears from the evidence that reasonable minds can come to but one conclusion, and viewing the evidence most strongly in favor of the nonmoving party, that conclusion is adverse to the nonmoving party.

*State ex rel. Howard v. Ferreri* (1994), 70 Ohio St.3d 587, 589, 639 N.E.2d 1189. Doubts must be resolved in favor of the nonmoving party. *Horton v. Harwick Chem. Corp.* (1995), 73 Ohio St.3d 679, 686–687, 653 N.E.2d 1196.

{¶ 14} Summary judgment is a procedural device to bring litigation to an end when there is nothing to try. *Gardens of Bay Landing Condominiums v. Flair Builders, Inc.* (1994), 96 Ohio App.3d 353, 358, 645 N.E.2d 82. The legal claims terminated should be only those without factual foundation. *Gross v. Western–Southern Life Ins. Co.* (1993), 85 Ohio App.3d 662, 667, 621 N.E.2d 412. Because summary judgment precludes a jury's consideration of the case, it should be granted with caution and used sparingly. *Shaw v. Cent. Oil Asphalt Corp.* (1981), 5 Ohio App.3d 42, 44, 5 OBR 45, 449 N.E.2d 3.

{¶ 15} The trial court is not permitted to weigh evidence or resolve issues of credibility on summary judgment. *Rogers v. Kazee* (1983), 10 Ohio App.3d 139, 140, 10 OBR 190, 460 N.E.2d 1149. It is not for the trial court to resolve factual issues on summary judgment, but to determine whether issues of material fact exist. See *Whitman v. Souder* (Dec. 12, 1985), 3d Dist. No. 13–84–30, 1985 WL 4387. "Civ.R. 56 merely requires that the trial court determine whether there are any genuine issues of material fact to be tried, not whether one party or the other will satisfy its burden of proof when the case eventually comes to trial." *King v. Hazen*, 11th Dist. No. 2005–A–0031, 2006-Ohio-4823, 2006 WL 2662757, at ¶ 59. It was not necessary for Cook to establish that she could prevail on her claims to defeat a motion for summary judgment. The question was whether there was a factual foundation to her claims.

{¶ 16} The only issues addressed by the summary judgment motion and the trial court's judgment were whether Sullivan lacked capacity to execute the quitclaim deed and expanded power of attorney, whether these documents had been executed by Sullivan due to undue influence by Reising, and whether Reising had breached his fiduciary duty in arranging for the execution of the documents.

### Lack of Capacity

{¶ 17} Cook contended that Sullivan lacked the mental capacity to execute either the expanded power of attorney or the quitclaim deed. The test to be used to determine mental capacity is the ability of the principal to understand the nature, scope, and extent of the business she is about to transact. *Vnerakraft, Inc. v. Arcaro* (1959), 110 Ohio App. 62, 64, 168 N.E.2d 623.

{¶ 18} In support of summary judgment on the issue of Sullivan's mental capacity, Reising pointed to the deposition testimony of King and Hom, both of whom were present when Sullivan executed each document. King and Hom each testified that Sullivan appeared to be competent at the time she executed the documents. Neither of these witnesses knew Sullivan, however, nor had they ever had any prior contact with her. King testified that she was not at Sullivan's home for long and that she had only a "very hazy recollection" of what transpired. Moreover, she remembered being at Sullivan's house on only one occasion, but she had apparently been there twice. Although King had been Sullivan's trust officer, she had dealt solely with Reising and another relative who had held a power of attorney. King had never spoken to Sullivan on the phone, nor had she met her on any other occasion.

{¶ 19} Hom testified that he had only these two meetings with Sullivan and that his interaction with her was very brief. When asked if Sullivan had said anything eccentric when he met with her, he indicated that he did not recall. He

further indicated that he had kept his conversation with her as short as possible because she did not have a very long attention span, and he wanted her to understand as much as possible. He testified that "[e]ven for a competent person," Medicaid issues are difficult to understand.

{¶ 20} To counter Reising's evidence, Cook presented the testimony of other witnesses, who had known Sullivan for years, to suggest that Sullivan may have lacked the ability to understand the nature and scope of these transactions. Several witnesses testified that Sullivan had a stuffed cat that she would often hold and pet and talk to as if it were alive. In her younger years, Sullivan apparently had several live cats as pets. Even King, who met Sullivan on only two occasions, had observed Sullivan talking to the stuffed cat. King admitted that this behavior did strike her as a little odd, but she explained that she had not been at the home long enough to get a sense of whether Sullivan really believed that the stuffed cat was alive.

{¶ 21} Cook attested that Sullivan had been in declining physical and mental health for many years prior to her death. One of Sullivan's in-home caregivers testified that Sullivan was very forgetful and did not know what was going on from one day to the next. Cook also attested that Sullivan would sometimes seem to be confused and talk about things that made no sense. For example, on one occasion, Sullivan repeatedly asked Cook why she had not come to get her "off the bridge," but Cook had no idea what she was talking about. Also, Sullivan sometimes seemed to be unaware that her sister Margaret had passed away and spoke of her as if she were still alive.

{¶ 22} Construing this evidence in favor of Cook, we find that there were genuine issues of material fact as to whether Sullivan had the requisite mental capacity to execute either the expanded power of attorney or the quitclaim deed.

## Undue Influence and Breach of Fiduciary Duty

{¶ 23} Because these claims are based on many of the same facts, they will be discussed together. To prevail on her claim of undue influence, Cook must ultimately prove the following: (1) Sullivan's susceptibility, (2) Reising's opportunity to improperly influence her, (3) the actual or attempted exertion of that improper influence, and (4) the result showing the effect of the influence. *West v. Henry* (1962), 173 Ohio St. 498, 510–511, 20 O.O.2d 119, 184 N.E.2d 200. Because the person who could give the best evidence is now deceased, "most evidence will be circumstantial, leaving the factfinder to draw permissible inferences." *Redman v. Watch Tower Bible & Tract Soc. of Pennsylvania* (1994), 69 Ohio St.3d 98, 102, 630 N.E.2d 676.

{¶ 24} A claim for breach of fiduciary duty is similar to one for ordinary negligence, with the difference being a need to establish that the duty arose out of a fiduciary relationship. A fiduciary relationship is defined as one " ' "in which special confidence and trust [are] reposed in the integrity and fidelity of another and there is a resulting position of superiority or influence, acquired by virtue of this special trust." ' " *Landskroner v. Landskroner*, 154 Ohio App.3d 471, 2003-Ohio-4945, 797 N.E.2d 1002, at ¶ 32, quoting *Ed Schory & Sons, Inc. v. Soc. Natl. Bank* (1996), 75 Ohio St.3d 433, 442, 662 N.E.2d 1074, quoting *In re Termination of Emp. of Pratt* (1974), 40 Ohio St.2d 107, 115, 69 O.O.2d 512, 321 N.E.2d 603.

{¶ 25} Reising does not dispute that he had a fiduciary relationship with Sullivan by virtue of having her power of attorney. Because he did not use his power of attorney to sign the relevant documents, however, he contends that no cause of action for breach of fiduciary duty may lie. This court disagrees. It is clear from the evidence, as will be explained in more detail below, that Reising arranged for Sullivan to execute these documents in his capacity as her power of attorney. He arranged for the document preparation and execution with King and Hom, both of whom spoke to him because he had Sullivan's power of attorney and assumed that he was acting in her best interest. Consequently, a claim for breach of fiduciary duty would lie if the evidence raised genuine issues of fact as to whether Reising breached his duty to act in Sullivan's best interest.

{¶ 26} In support of his summary judgment motion on these claims, Reising pointed to his own deposition testimony and the deposition testimony of King and Hom to establish that he was acting in Sullivan's best interest and that he did not exert any undue influence over her to get her to sign either of these documents. Even Reising's own evidence tends to raise issues of fact on these claims. Moreover, Cook responded with additional evidence that raised questions as to whether Reising may have pressured Sullivan to sign papers that she did not even understand, whether he had misinformed Sullivan and others about the purpose of the transactions, and whether he had abused his position as Sullivan's power of attorney in arranging for her to sign these documents.

{¶ 27} Reising portrayed himself to some outside his family as a devoted nephew who tended to his aunt's daily needs, including administering her medicine and paying all of her bills. This was how he portrayed himself to both King and Hom. Hom testified that it had been his understanding that Reising was Sullivan's primary caregiver.

{¶ 28} Other evidence demonstrated that Reising did not play such a significant role in his aunt's caretaking, because most of her daily needs were handled by her in-home caretakers. More than one witness testified that it was Cook who got Sullivan's medications and dispensed them into pill dispensers to be

administered daily by the caretakers. Reising did not handle Sullivan's finances but instead took all of her bills to King so she could pay the bills from Sullivan's trust. Reising merely drove Sullivan to medical appointments and visited her once every week or two. When viewed in light of all the surrounding circumstances, we conclude that the fact that Reising greatly overstated his caretaking role to King and Hom tends to raise questions about whether he was acting in his aunt's best interest when the expanded power of attorney and quitclaim deed were executed.

{¶ 29} Another disputed fact is where the idea to quitclaim the deed to Sullivan's house originated. Reising testified that the idea of quitclaiming the house to a relative had come from King. He testified that he had asked King about the possibility of getting a reverse mortgage on Sullivan's home to help finance her care, and King recommended instead that they quitclaim the house to a relative. King testified, however, that Reising never asked her about a reverse mortgage, but that he had asked about Medicaid planning and quitclaiming the property to a relative. She told him that she knew nothing about that and referred him to Hom.

{¶ 30} Reising met with Hom and purported to hire him to represent Sullivan in this matter. Reising went to Hom's office without his aunt, however, and he and Hom discussed the situation and decided on the appropriate action to take. Reising, apparently acting as his aunt's power of attorney, made decisions on her behalf that she would execute an expanded power of attorney and would later quitclaim the title to her house to a relative. Hom prepared the necessary documents without any input from Sullivan. In fact, Sullivan was told nothing about the expanded power of attorney or the quitclaim deed until Hom and King came to her house with the documents prepared for execution.

{¶ 31} There was also disputed evidence about the primary purpose for Sullivan's quitclaiming the deed to her house. Hom testified that the entire purpose for executing these documents was to protect Sullivan's home that had been in her family since the 1880s and that Reising had contacted him for the express purpose of protecting the family home. To accomplish this goal, Reising and Hom agreed to apply for Medicaid for Sullivan and transfer the home to a relative to prevent a forced sale of the home to cover Sullivan's medical expenses. When the time came for Sullivan to pick a relative, she chose Reising, who happened to be the only relative in the room and the only one who had any knowledge that Sullivan would be quitclaiming title to the property.

{¶ 32} Reising testified, on the other hand, that the purpose of the title transfer was for him to sell the house and use the proceeds to help pay Sullivan's medical and living expenses that were not covered by her own funds or Medicaid. Thus, he made plans to sell the house almost immediately and made no attempt

to sell it to a relative. He likewise sold most of Sullivan's personal property at a public auction.

{¶ 33} Hom conceded that there was no language in the quitclaim deed that limited Reising's ability to sell the house outside the family, but he testified that he was trusting that Reising would act "equitably" in that situation and do as Sullivan wanted and keep the home in the family. He further explained that the understanding was that if the house was sold, it would be according to Sullivan's wishes that the home stay in the family.

{¶ 34} At the time the documents were executed, there were other facts that created questions about the propriety of Reising's motives and actions. In addition to the fact that no other relatives were present or had been told about these transactions, on each of the two occasions that Hom and King came to Sullivan's house to have her sign documents, Reising told the in-home caretaker to leave the house. His only explanation for doing this was that he did not trust her. He conceded that the caretaker and Sullivan got along well, and given that she was Sullivan's daily companion who might have helped her make an informed decision about whether to sign the documents, the fact that he required her to leave creates a reasonable inference that he may not have had Sullivan's best interest in mind.

{¶ 35} Because Sullivan was blind, she could not read the power-of-attorney or quitclaim-deed documents herself and was dependent on others to inform her about what she was signing. The only surviving witnesses to these transactions, Reising, King, and Hom, recounted different versions of what was explained to Sullivan at the time. Reising indicated that he had not told Sullivan anything about these transactions ahead of time and that he "never talked to her about her money." He left it to Hom and King to explain the documents and their significance to Sullivan. Reising testified that both Hom and King thoroughly explained the implications of these transactions to Sullivan before she signed each document.

{¶ 36} Hom testified, however, that he did not recall what he had explained to Sullivan but that he kept the conversation as simple as possible so that Sullivan could understand him. King testified that she never spoke to Sullivan about any of this but that she essentially attended each meeting to act as a witness.

{¶ 37} Hom further testified that the thought of undue influence by Reising did cross his mind at the time Sullivan signed the quitclaim deed, but that he assumed that King had a better background with this family than he did. He apparently was under the impression that King had frequent dealings with Sullivan and Reising and that she trusted Reising to be looking out for Sullivan's best interest. In fact, King testified that she had no other dealings with Sullivan

and limited interaction with Reising. She further testified that she never read these documents and she did not know why they were executed.

{¶ 38} Actions taken by both Sullivan and Reising after Sullivan signed the quitclaim deed also tended to add to the questions surrounding the true nature of these transactions. Later in the day after signing the quitclaim deed, Sullivan was crying and told her in-home caretaker that Reising had "made her sign the papers" to sign her house away and she did not know where she was going to live.

{¶ 39} Reising testified that it was understood from the beginning that Sullivan transferred the house to him with the intention that he would use the proceeds to help pay her expenses and that he would keep the remaining proceeds when she passed away. This testimony was likewise disputed. Cook and her husband attested that Reising had told them that he was holding the proceeds of the sale of the house in trust for Sullivan and her heirs. King also testified that Reising told her afterwards that he planned to gift the house to Sullivan's heirs equally. Months later, he told her that Sullivan wanted him the have the property, so he planned to keep it.

{¶ 40} Despite Reising's knowledge that Sullivan's wishes were to stay in her home as long as she could and to keep her home in her family as it had been since the 1880s, he almost immediately moved her into a nursing home and made plans to sell the house on the open market. He sold Sullivan's house and much of her personal property and kept the proceeds. He was not named as one of the eight beneficiaries in Sullivan's will, yet he ultimately received $163,000, 73 percent of her total assets.

{¶ 41} Construing all of this evidence in favor of the nonmoving party, we find there to be genuine issues of material fact as to whether Sullivan lacked the mental capacity to execute the expanded power of attorney and quitclaim deed and whether Reising exerted undue influence over her and/or breached his fiduciary duty to her by persuading her to sign the documents. The trial court inappropriately granted summary judgment on Cook's claims. The assignment of error is sustained.

### III

{¶ 42} The assignment of error is sustained, the judgment of the Lorain County Court of Common Pleas is reversed, and the cause is remanded for proceedings consistent with this opinion.

Judgment reversed
and cause remanded.

DICKINSON, P.J., and WHITMORE, J., concur.