[Cite as *Schiavoni v. Roy*, 2012-Ohio-4435.]

| STATE OF OHIO | ) | IN THE COURT OF APPEALS |
|---|---|---|
| | )ss: | NINTH JUDICIAL DISTRICT |
| COUNTY OF MEDINA | ) | |

HALLIE SCHIAVONI

    Appellee

    v.

BRIAN A. ROY, et al.

    Appellant

C.A. No.     11CA0108-M

APPEAL FROM JUDGMENT
ENTERED IN THE
COURT OF COMMON PLEAS
COUNTY OF MEDINA, OHIO
CASE No.    2010 02 CA 00006

DECISION AND JOURNAL ENTRY

Dated: September 28, 2012

DICKINSON, Judge.

INTRODUCTION

**{¶1}** Hallie Schiavoni sued her brother, Brian Roy, for conversion, breach of fiduciary duty, undue influence, unjust enrichment, and fraud, alleging that he had misappropriated assets that belonged to their mother, Jean Roy. Mr. Roy, who Ms. Schiavoni also sued in his capacity as executor of Ms. Roy's will, counterclaimed, alleging that Ms. Schiavoni had converted some of their mother's bonds and failed to repay loans to her. Following a trial to the bench, the probate court found in favor of Ms. Schiavoni and ordered Mr. Roy to distribute the misused assets to Ms. Schiavoni or Ms. Roy's estate. It also awarded Ms. Schiavoni prejudgment interest and attorney's fees. Mr. Roy has appealed, arguing that the probate court did not have jurisdiction over Ms. Roy's annuities, that the court's findings were not supported by the evidence and were against the manifest weight of the evidence, and that the court incorrectly awarded Ms. Schiavoni prejudgment interest and attorney fees. We affirm because the probate

court had jurisdiction over the annuities, its decision was supported by sufficient evidence and was not against the manifest weight of the evidence, and it correctly awarded Ms. Schiavoni her prejudgment interest and attorney fees.

## BACKGROUND

{¶2} After her husband died in 2000, Ms. Roy executed a will that appointed Mr. Roy as her executor and Ms. Schiavoni as her successor executor. The will also divided her estate equally between her two children. On the same day, she executed a durable power of attorney that named Mr. Roy as her attorney-in-fact. The will and power-of-attorney documents were prepared by Marcia Bullard, a lawyer who once worked with Mr. Roy's wife.

{¶3} Over the course of the next few years, Ms. Roy developed dementia. She subsequently moved into an assisted-living facility that was near Mr. Roy's house. Mr. Roy and his wife visited Ms. Roy regularly, and Mr. Roy began handling her financial affairs. Ms. Schiavoni testified that she also visited her mother regularly at the facility when she was in town, but said that she spent almost half the year living out-of-state. Ms. Roy died in 2008.

## JURISDICTION OVER ANNUITIES

{¶4} Mr. Roy's first assignment of error is that the probate court lacked jurisdiction over two annuities that Ms. Roy had at the time of her death. One of the annuities was from the Hartford Life and Annuity Insurance Company. Ms. Roy purchased it in 2000 and initially named her children as co-beneficiaries. In 2007, however, she designated Mr. Roy as the sole beneficiary. The other annuity was from the Standard Life Insurance Company of Indiana. Mr. Roy bought it for Ms. Roy, allegedly at her direction, in February 2006. Mr. Roy was the sole beneficiary.

**{¶5}** In its decision, the probate court determined that Ms. Roy lacked the mental capacity to change the beneficiary of the Hartford annuity. It also determined that the change-of-beneficiary designation was presumptively the product of undue influence and that Mr. Roy had failed to rebut the presumption by credible evidence. Regarding the Standard Life annuity, it determined that Mr. Roy had failed to rebut the presumption that the purchase was not the result of undue influence. It ordered Mr. Roy to pay half of the Hartford-annuity death benefit to Ms. Schiavoni and to pay the Standard-Life-annuity death benefit to Ms. Roy's estate.

**{¶6}** Mr. Roy has argued that the probate court did not have jurisdiction to determine any issues regarding the annuities because they were not probate assets. Under Section 2101.24(A)(1)(c) of the Ohio Revised Code, "the probate court has exclusive jurisdiction . . . [t]o direct and control the conduct and settle the accounts of executors and administrators and order the distribution of estates." That provision vests the probate court with "full power to determine what property is lawfully included in an inventory as assets." *In re Estate of Boone*, 190 Ohio App. 3d 799, 2010-Ohio-6269, ¶ 36 (7th Dist.). The probate court also "has jurisdiction to hear and determine actions involving the misuse of a power of attorney." *Estate v. Niemi v. Niemi*, 11th Dist. No. 2008-T-0082, 2009-Ohio-2090, ¶ 36 (citing R.C. 2101.24(B)(1)(b)); *see also* Section 2101.24(A)(1)(m) (providing that "the probate court has exclusive jurisdiction . . . [t]o direct and control the conduct of fiduciaries . . . .").

**{¶7}** Because Ms. Roy obtained the Standard Life annuity through Mr. Roy's exercise of the power of attorney, the probate court had jurisdiction to determine whether obtaining the annuity was a proper exercise of his authority. R.C. 2101.24(B)(1)(b). *See Levy v. Thompson*, 2d Dist. No. 20641, 2006-Ohio-5312, ¶ 20 (concluding that sister's alleged misuse of power of attorney provided probate court with jurisdiction to determine whether designation on annuity

should be voided). Similarly, because Mr. Roy completed most of the Hartford annuity change-of-beneficiary form and he was with Ms. Roy when she signed it, the probate court had jurisdiction to determine whether he exercised undue influence over her regarding who she named as her beneficiary. *See* R.C. 2101.24(B)(1)(b); *In re Scott*, 111 Ohio App. 3d 273, 276 (6th Dist. 1996) ("The holder of a power of attorney has a fiduciary relationship with his or her principal. Such a relationship is 'one in which special confidence and trust is reposed in the integrity and fidelity of another . . . by virtue of this special trust.'") (quoting *Stone v. Davis*, 66 Ohio St. 2d 74, 78 (1981)). Accordingly, we conclude that the probate court had jurisdiction to determine whether the purchase of the Standard Life annuity and the change of beneficiary of the Hartford annuity were valid.

{¶8} Having determined that the annuity-beneficiary designations were not valid, the probate court had authority to decide how the annuities' death benefits should be distributed. R.C. 2101.24(C) ("The probate court has plenary power at law and in equity to dispose fully of any matter that is properly before the court, unless the power is expressly otherwise limited or denied by a section of the Revised Code."). It, therefore, had authority to award Ms. Schiavoni half of the Hartford annuity and to order Mr. Roy to pay the amount he had received from the Standard Life annuity to Ms. Roy's estate. Mr. Roy's first assignment of error is overruled.

LACK OF CAPACITY

{¶9} Mr. Roy's second assignment of error is that the probate court's lack-of-mental-capacity finding was not supported by sufficient evidence and was against the manifest weight of the evidence. The probate court found that, after July 2006, Ms. Roy "was incompetent and incapable of managing her affairs and legally unable to give her property to anyone or any

institution." "[She] lacked the mental acuity to comprehend the nature of the transactions, their effect on her estate and the manifestly unequal treatment these transactions had for her children."

{¶10} Regarding civil cases, the Ohio Supreme Court has written that, "[if] applying a sufficiency-of-the-evidence standard, a court of appeals should affirm a trial court [if] 'the evidence is legally sufficient to support the [judgment] as a matter of law.'" *Bryan–Wollman v. Domonko*, 115 Ohio St. 3d 291, 2007-Ohio-4918, ¶ 3 (quoting *State v. Thompkins*, 78 Ohio St. 3d 380, 386 (1997)). When reviewing the manifest weight of the evidence in a civil case, this Court "weighs the evidence and all reasonable inferences, considers the credibility of witnesses and determines whether in resolving conflicts in the evidence, the [finder of fact] clearly lost its way and created such a manifest miscarriage of justice that the [judgment] must be reversed and a new trial ordered." *Eastley v. Volkman*, 132 Ohio St. 3d 328, 2012–Ohio–2179, ¶ 20 (quoting *Tewarson v. Simon*, 141 Ohio App. 3d 103, 115 (9th Dist. 2001)).

{¶11} "The test to be used to determine mental capacity is the ability of the principal to understand the nature, scope, and extent of the business she is about to transact." *Cook v. Reising*, 181 Ohio App. 3d 546, 2009-Ohio-1131, ¶ 17 (9th Dist.). "The burden is upon the party claiming incompetence to prove the matter by clear and convincing evidence." *Modie v. Andrews*, 9th Dist. No. 19543, 2000 WL 1026682, *4 (July 26, 2000).

{¶12} Dr. David Feldman, a psychiatrist whose focus is in geriatric psychiatry, testified that he had reviewed Ms. Roy's medical records to develop an opinion on whether she had the capacity to manage her affairs. He noted that, although the records he received only went back to 2000, they indicated that she had pre-existing depression and anxiety problems. The records showed that she then developed an Alzheimer's-type dementia syndrome as well as behavior problems, agitation, and paranoia, all of which contributed to a "substantial" cognitive decline

between 2000 and 2008. In 2000, her cognitive decline was mild, with only some short-term memory problems. By the time Ms. Roy fractured her shoulder in 2003, however, she "was very confused," which was partially caused by her progressive dementia.

{¶13} Dr. Feldman testified that, after 2003, Ms. Roy continued to have a "pretty ongoing level of cognitive decline," noting that the medical personnel who saw her generally documented her short-term memory impairment and orientation problems. In 2005, for instance, she told nurses that she thought someone was trying to murder her and, in 2006, she scored 18 out of 30 on a Mini-Mental Status Examination. Dr. Feldman explained that a score below 24 is considered "demented" and one under 20 is "in the moderate range of dementia." He also noted that when a psychologist saw her on a regular basis in 2006, Ms. Roy was consistently disoriented regarding time. He opined that between 2003 and 2006 she "was probably in the moderate cognitively impaired range." In addition, he noted that her anxiety and depression would have also impaired her mental capacity. Dr. Feldman concluded that Ms. Roy lacked the "capacity to make high-level or complex financial decisions . . . in the last three years of her life[.]"

{¶14} Dr. Canice Barnett, a psychologist who attempted to treat Ms. Roy in 2006, testified about her sessions with Ms. Roy. According to Dr. Barnett, Ms. Roy had generalized anxiety disorder and dementia with depression. She explained that Ms. Roy was very anxious and worried and sometimes refused to allow Dr. Barnett into her room, requiring Dr. Barnett to conduct their sessions from the hallway. Dr. Barnett said that Ms. Roy sometimes thought that people were stealing from her or that things had gone missing, even though the items were still in her room. Dr. Barnett also said that Ms. Roy's memory was moderately impaired, that she would talk about the same thing again and again, that she would move from one topic to another

even if there was only a loose association, and that she was very reluctant to leave her room. On one occasion, Dr. Barnett observed Ms. Roy become obsessed with a group of flies outside, concerned that they were going to enter her apartment and land in her hair, even though the window was closed. On another occasion, Ms. Roy was not dressed when Dr. Barnett arrived, even though it was around the time for one of her favorite activities at the center. Dr. Barnett said that she stopped attempting to treat Ms. Roy after 13 sessions because Ms. Roy would get upset by the fact that she could not remember why Dr. Barnett was there and the sessions were not having any therapeutic effect.

{¶15} The probate court found that Ms. Roy suffered from anxiety and depression during her lifetime and that her conditions became more pronounced after the death of her husband in 2000. By 2003, she was diagnosed with Alzheimer's disease. It found that, when Ms. Roy entered assisted-living, she had had episodes of acute paranoia and a general decline in her mental ability. Relying on Dr. Feldman's and Dr. Barnett's testimony, it found that, after July 2006, she "was incompetent and incapable of managing her affairs and legally unable to give her property to anyone or any institution." It also found that she "lacked the mental acuity to comprehend the nature of the transactions, their effect on her estate and the manifestly unequal treatment these transactions had for her children."

{¶16} Mr. Roy has argued that the probate court incorrectly gave weight to Dr. Feldman's opinion because Dr. Feldman never met Ms. Roy. He has noted that Dr. Barnett testified that, despite Ms. Roy's difficulties, she would have been capable of making a decision to change the beneficiary of a life insurance policy throughout the time that she attempted to treat her. He has also noted that Dr. Kenneth Biros, a doctor whose practice is devoted entirely to extended-care patients, testified that someone with only a mild cognitive impairment would not

lack the ability to make decisions about the disposition of her assets. Dr. Biros also explained that, even if someone has moderate or severe cognitive impairment, she could still have periods of lucidity in which she could communicate her desires to others. Mr. Roy has also noted that Ms. Roy's lawyer, Ms. Bullard, testified that she did not observe any signs of impairment when she reviewed a trust document with Ms. Roy in 2008. Mr. Roy has also noted that assessments by the staff at Ms. Roy's assisted living facility in 2007 and 2008 indicated that, although Ms. Roy had periods of confusion, she was alert and oriented to self and family, understood others and communicated well, and was still independent in dressing, bathing, mobility, vision, transferring, and eating. Mr. Roy has further argued that there was no evidence that Ms. Roy was impaired at the time she executed the documents at issue in this case.

{¶17} The level of mental capacity that Ms. Roy needed to make decisions about her finances depended on the nature of the transaction. *Cook v. Reising*, 181 Ohio App. 3d 546, 2009-Ohio-1131, ¶ 17 (9th Dist.). Regarding the annuities, Mr. Roy has argued that, even though they could be considered a fairly complex financial instrument, the ultimate decision of who received the death benefit was a fairly straight forward question, similar to whom should be the beneficiary of one's will. The Ohio Supreme Court has held that "[t]estamentary capacity exists when the testator has sufficient mind and memory: First, to understand the nature of the business in which he is engaged; second, to comprehend generally the nature and extent of his property; third, to hold in his mind the names and identity of those who have natural claims upon his bounty; fourth, to be able to appreciate his relation to the members of his family." *Niemes v. Niemes*, 97 Ohio St. 145, paragraph four of the syllabus (1917). Mr. Roy has also argued that the various monetary gifts that Ms. Roy made to him did not require a high degree of mental capacity.

{¶18} Ms. Schiavoni testified that, until Ms. Roy developed dementia, she had always treated her son and daughter equally when it came to financial distributions. Her testimony is supported by the beneficiary selections that Ms. Roy made before she developed dementia. Dr. Barnett testified that, although Ms. Roy would often talk about her family, she usually only talked about Mr. Roy and his wife. She said that Ms. Roy mentioned Ms. Schiavoni on only one occasion, that it was "very minimal," and that it was only to inform her that Ms. Roy would not allow the doctor to talk to Ms. Schiavoni about their sessions. Regarding grandchildren, Dr. Barnett said that Ms. Roy only ever mentioned Mr. Roy's children and never mentioned Ms. Schiavoni's children.

{¶19} Mr. Roy argued that Ms. Roy had legitimate reasons for treating him more favorably than Ms. Schiavoni, alleging that Ms. Schiavoni obtained loans from Ms. Roy that she did not repay, that she misappropriated some of Ms. Roy's bonds and that, at one point, she changed the mailing address for the Hartford annuity to her home address. The probate court, however, found him not credible.

{¶20} Upon review of the record, we conclude that Ms. Schiavoni presented sufficient evidence from which the probate court could determine that there was clear and convincing evidence that Ms. Schiavoni did not have a sufficient degree of mental capacity to change the beneficiary of the Hartford annuity, authorize Mr. Roy to obtain the Standard Life annuity and open a joint bank account with right of survivorship, or appreciate the quantity, size, and frequency of monetary gifts that she was making to Mr. Roy. The court's conclusion is supported by the testimony of Dr. Feldman and Dr. Barnett, their records, and the reports generated by the assisted-living facility. We also conclude that the probate court did not lose its way when it found that there was clear and convincing evidence that Ms. Roy failed to

appreciate her relation to all of the members of her family at the time she changed the beneficiary of the Hartford annuity, told Mr. Roy to obtain the Standard Life annuity, told Mr. Roy to open the checking account, and made numerous monetary gifts to Mr. Roy and his family. Mr. Roy's second assignment of error is overruled.

## UNDUE INFLUENCE

**{¶21}** Mr. Roy's third assignment of error is that the probate court's judgment regarding who should receive the Hartford and Standard Life annuity death benefits was not supported by sufficient evidence and was against the manifest weight of the evidence. In particular, he has argued that the court incorrectly concluded that the beneficiary designations were the product of undue influence and a breach of his fiduciary duty to Ms. Roy.

**{¶22}** "The essential elements of undue influence are: (1) a susceptible testator, (2) another's opportunity to exert influence on the testator, (3) the fact of improper influence exerted or attempted, and (4) a result showing the effect of such influence." *Kryder v. Kryder*, 9th Dist. 25665, 2012-Ohio-2280, ¶ 30. "[If] a fiduciary or confidential relationship exists between the donor and the donee," however, "the transfer is regarded with suspicion that the donee may have brought undue influence to bear upon the donor." *Modie v. Andrews*, 9th Dist. No. 19543, 2000 WL 1026682, *4 (July 26, 2000). "In such a case, a presumption of undue influence arises, and the donee bears the burden going forward and showing, by a preponderance of the evidence, that the gift was free from undue influence." *Id.* The probate court found that Mr. Roy, who was Ms. Roy's fiduciary, failed to rebut the presumption that he unduly influenced his mother.

**{¶23}** Mr. Roy has argued that it was reasonable for his mother to give her assets to him because he devoutly attended to her and she had a history of problems with Ms. Schiavoni. He has argued that, in addition to not paying back loans and taking savings bonds from Ms. Roy,

Ms. Schiavoni did not visit Ms. Roy at the assisted-living facility, had a confrontation with her in December 2006, and did not give her a Christmas present in 2006. He has also argued that Ms. Schiavoni took things from Ms. Roy's room at the facility. Regarding the Hartford annuity, Mr. Roy has argued that, originally, he was the sole beneficiary of a joint annuity that his parents had before his father died. When Ms. Roy converted it after her husband's death, she named both of her children as beneficiaries. Her later decision to name him as the sole beneficiary, therefore, was just going back to the original designation.

{¶24} As we have previously noted, the probate court did not find Mr. Roy's testimony about the unpaid loans and stolen bonds credible. Ms. Schiavoni testified that she never failed to give her mother a Christmas present, which the court found credible. Mr. Roy's claim that Ms. Schiavoni did not visit her mother is inconsistent with his assertion that she had a fight with Ms. Roy in December 2006 and stole things from Ms. Roy's room. Regarding the history of the Hartford annuity, Mr. Roy did not present any written evidence that the funds for the Hartford annuity came from a prior annuity.

{¶25} It is undisputed that Mr. Roy obtained the Standard Life annuity for Ms. Roy using his authority as her attorney-in-fact and that he helped her complete the change of beneficiary form for the Hartford annuity. Upon review of the record, we conclude that the probate court's decision that he failed to rebut the presumption of undue influence regarding those transactions was supported by sufficient evidence and was not against the manifest weight of the evidence. Mr. Roy's third assignment of error is overruled.

MORTGAGE PAYMENTS AND CASH GIFTS

{¶26} Mr. Roy's fourth assignment of error is that the probate court's judgment regarding Ms. Roy's cash gifts to Mr. Roy, including paying his mortgage, was not supported by

sufficient evidence and was against the manifest weight of the evidence. As with the annuity-beneficiary designations, the court found that the purported gifts were the product of undue influence.

{¶27} According to Mr. Roy, when he went through Ms. Roy's mail with her, if there were any checks that were payable to her, she would tell him that she wanted him to have the money instead. He, therefore, would deposit the sum in their joint checking account then write a check to his home mortgage company. Mr. Roy also said that, after his mother moved into the assisted-living facility, he learned that she could qualify for additional Veterans benefits. To be eligible for the program, she needed to dispose of some of her assets, and he did that by gifting $24,000 to himself and his wife. Mr. Roy further said that Ms. Roy insisted on paying for his gas when he took her on trips away from the facility and that she paid to have his car washed because she enjoyed the experience of going through an automated car wash.

{¶28} The probate court found that Mr. Roy failed to rebut the presumption that the gifts he made to himself from Ms. Roy's assets were not the product of undue influence. It found that, although he may have originally meant to act as a dutiful son, over time he began "pilfering" from his mother's estate. It noted that the mortgage payments, car expenses, and other cash gifts were not the only assets that Mr. Roy did not use for Ms. Roy's benefit. Specifically, it found that he had used his mother's funds to make donations to his favorite charities and that he had given hundreds of dollars of her money to a Lutheran ministry, even though she was not Lutheran. He also purchased all of her dietary supplements at full price from a company that he owned. The court further noted that there was a provision in Ms. Roy's power-of-attorney document that limited his ability to make gifts to himself to $5000 annually.

{¶29} In support of his argument, Mr. Roy has pointed out that Ms. Roy signed one of the checks that he wrote to his mortgage company. That was the only document that he presented, however, to support his claim that the sums of money he received from Ms. Roy were gifts. While the check was from 2005, a time before the time by which the court found that Ms. Roy was incompetent, that fact does not conclusively establish that the payment was a gift, that the other mortgage payments were gifts, or that any of the other financial benefits Mr. Roy received were gifts. We conclude that the probate court's conclusion that Mr. Roy failed to rebut the presumption of undue influence was supported by sufficient evidence and was not against the manifest weight of the evidence. Mr. Roy's fourth assignment of error is overruled.

## ATTORNEY FEES

{¶30} Mr. Roy's fifth assignment of error is that the probate court incorrectly awarded Ms. Schiavoni her attorney fees. He has argued that the court incorrectly ordered him to pay her fees because it did not award punitive damages. He has also argued that the court incorrectly authorized Ms. Roy's estate to reimburse Ms. Schiavoni for her attorney fees.

{¶31} "Ohio has long adhered to the 'American rule' with respect to recovery of attorney fees: a prevailing party in a civil action may not recover attorney fees as a part of the costs of litigation." *Wilborn v. Bank One Corp.*, 121 Ohio St. 3d 546, 2009–Ohio–306, ¶ 7 (quoting *Nottingdale Homeowners' Ass'n Inc. v. Darby*, 33 Ohio St. 3d 32, 33 (1987)). "However, there are exceptions to this rule. Attorney fees may be awarded when a statute or an enforceable contract specifically provides for the losing party to pay the prevailing party's attorney fees . . . or when the prevailing party demonstrates bad faith on the part of the unsuccessful litigant[.]" *Id.* They may also be awarded as an element of compensatory damages if punitive damages are awarded. *Zoppo v. Homestead Ins. Co.*, 71 Ohio St. 3d 552, 558 (1994).

{¶32} The probate court found that Mr. Roy should pay Ms. Schiavoni's attorney fees because he had acted in bad faith. Mr. Roy has not contested the court's finding. Rather, he has argued that, in *Zappitelli v. Miller*, 114 Ohio St. 3d 102, 2007-Ohio-3251, the Ohio Supreme Court held that attorney fees may only be recovered as an element of compensatory damages if punitive damages have been awarded. *Id.* ¶ 6. *Zappitelli*, however, did not involve an allegation of bad faith. Moreover, since *Zappitelli*, the Ohio Supreme Court has continued to recognize that attorney fees may be recovered in actions involving bad faith. *State ex rel. Waiters v. Szabo*, 129 Ohio St. 3d 122, 2011-Ohio-3088, ¶ 15; *Wilborn v. Bank One Corp.*, 121 Ohio St. 3d 546, 2009–Ohio–306, ¶ 7; *Reagans v. MountainHigh Coachworks Inc.*, 117 Ohio St. 3d 22, 2008-Ohio-271, ¶ 36; *State ex rel. Citizen Action for a Livable Montgomery v. Hamilton County Bd. of Elections*, 115 Ohio St. 3d 437, 2007-Ohio-5379, ¶ 55. The Supreme Court has not held that an award of punitive damages is a prerequisite to an award of attorney fees when the award is based on the bad-faith conduct of the defendant. Accordingly, we are not persuaded to reconsider our precedent on this issue. *E.g.*, *Technical Constr. Specialties Inc. v. New Era Builders Inc.*, 9th Dist. No. 25776, 2012-Ohio-1328, ¶ 26; *Mauger v. Inner Circle Condo. Owners Ass'n*, 9th Dist. No. 10CA0046-M, 2011-Ohio-1533, ¶ 23; *LEH Props. Inc. v. Pheasant Run Ass'n*, 9th Dist. No. 10CA009780, 2011-Ohio-516, ¶ 22.

{¶33} Regarding whether the court correctly authorized the estate to reimburse Ms. Schiavoni for her attorney fees, Section 2113.36 of the Ohio Revised Code provides that, "[i]f an attorney has been employed in the administration of the estate, reasonable attorney fees paid by the executor or administrator shall be allowed as a part of the expenses of administration." Ohio courts have held that this language authorizes the probate court to order an estate to pay an attorney employed by an heir or beneficiary of the estate if the attorney's services benefited the

estate. *In re Keller*, 65 Ohio App. 3d 650, 656 (8th Dist. 1989); *see In re Estate of Brown*, 83 Ohio App. 3d 540, 542 (12th Dist. 1992). Known as the "common fund theory" of recovery, it is "based on 'the equitable doctrine that where one has created, augmented, or preserved a fund he may be compensated therefrom.'" *In re Estate of Fugate*, 86 Ohio App. 3d 293, 298 (1993); *Brown*, 83 Ohio App. 3d at 542 (quoting *In re Colosimo*, 104 Ohio App. 342, 342-43 (2d Dist. 1957)). The test to determine whether the estate has benefited is whether all of the beneficiaries of the estate, in that capacity, have become entitled to receive a greater sum than they would have received without the lawyer's services. *Fugate*, 86 Ohio App. 3d at 299. This Court has applied the common fund doctrine in multiple cases. *Nat'l City Bank NE v. Depew*, 9th Dist. Nos. 18372, 18436, 1997 WL 823968, *7 (Dec. 31, 1997); *Pedler v. Pedler*, 9th Dist. No. 9812, 1981 WL 3937, *1-2 (Apr. 15, 1981).

{¶34} Mr. Roy has argued that the common fund doctrine does not apply to the facts of this case because Ms. Schiavoni was primarily serving her own interests when she sued to recover the assets he converted. In its judgment, the probate court ordered Mr. Roy to return approximately $135,500 to the estate. Under the terms of Ms. Roy's will, her estate was to be divided between Mr. Roy and Ms. Schiavoni equally. Although Mr. Roy is the source of the recovered assets, in his capacity as a beneficiary of Ms. Roy's will, both he and Ms. Schiavoni will receive more than they would have if Ms. Schiavoni had not brought this action. The court, therefore, correctly determined that Ms. Schiavoni could recover her attorney fees from the estate. Mr. Roy's fifth assignment of error is overruled.

PREJUDGMENT INTEREST

{¶35} Mr. Roy's sixth assignment of error is that the probate court incorrectly awarded Ms. Schiavoni prejudgment interest. He has argued that her motion for prejudgment interest was

untimely under Section 1343.03(C) of the Ohio Revised Code. Although there is no time limit in the text of Section 1343.03(C), the Ohio Supreme Court has held that a motion for prejudgment interest under that section "must be made to the trial court following the verdict or decision in the case and in no event later than fourteen days beyond the entry of judgment." *Cotterman v. Cleveland Elec. Illuminating Co.*, 34 Ohio St. 3d 48, paragraph one of the syllabus (1987). The probate court initially announced its decision on April 13, 2011. Ms. Schiavoni did not move for prejudgment interest until May 5, 2011.

**{¶36}** Mr. Roy's argument is without merit because the probate court's initial decision was not the court's judgment. "A judgment is 'the final determination of the rights of the parties in action.'" *Countrywide Home Loans Inc. v. Yankovich*, 9th Dist. No. 24768, 2010-Ohio-4651, ¶ 3 (quoting *Hoffman v. Knollman*, 135 Ohio St. 170, 175 (1939)); *GTE Automatic Elec. Inc. v. ARC Indus. Inc.*, 47 Ohio St. 2d 146, 150 (1976). Although the court decided most of the issues in this case in its April 13, 2011, journal entry, it failed to dispose of Ms. Schiavoni's surcharge and fraud claims. The court did not dispose of those claims until October 31, 2011. Accordingly, Ms. Schiavoni's motion, which was filed in May 2011, was timely under *Cotterman. See Coon v. Technical Constr. Specialties Inc.*, 9th Dist. No. 24542, 2010-Ohio-417, ¶ 23 (concluding that a court may consider a motion for prejudgment interest that was filed before judgment was entered). Mr. Roy's sixth assignment of error is overruled.

CONCLUSION

**{¶37}** The probate court had jurisdiction to determine the validity of the change of beneficiary designation for the Hartford annuity and whether Mr. Roy properly obtained the Standard Life annuity. Its decision regarding whether Mr. Roy converted Ms. Roy's assets is supported by sufficient evidence and is not against the manifest weight of the evidence. The

court also correctly awarded Ms. Schiavoni prejudgment interest and her attorney fees. The judgment of the Medina County Probate Court is affirmed.

Judgment affirmed.

———

There were reasonable grounds for this appeal.

We order that a special mandate issue out of this Court, directing the Court of Common Pleas, County of Medina, State of Ohio, to carry this judgment into execution. A certified copy of this journal entry shall constitute the mandate, pursuant to App.R. 27.

Immediately upon the filing hereof, this document shall constitute the journal entry of judgment, and it shall be file stamped by the Clerk of the Court of Appeals at which time the period for review shall begin to run. App.R. 22(C). The Clerk of the Court of Appeals is instructed to mail a notice of entry of this judgment to the parties and to make a notation of the mailing in the docket, pursuant to App.R. 30.

Costs taxed to Appellant.

CLAIR E. DICKINSON
FOR THE COURT

WHITMORE, P. J.
BELFANCE, J.
CONCUR.

APPEARANCES:

RONALD N. TOWNE, TIMOTHY HANNA, and ANN L. WEHENER, Attorneys at Law, for Appellant.

PATRICIA J. SCHRAFF and JOHN P. THOMAS, Attorneys at Law, for Appellee.