[Cite as *Pelmar USA, L.L.C. v. Mach. Exchange Corp.*, 2012-Ohio-3787.]

| | | | |
|---|---|---|---|
| STATE OF OHIO | ) | | IN THE COURT OF APPEALS |
| | )ss: | | NINTH JUDICIAL DISTRICT |
| COUNTY OF SUMMIT | ) | | |

| | | |
|---|---|---|
| PELMAR USA, LLC, et. al. | | C.A. No.    25947 |
| Appellants | | |
| v. | | APPEAL FROM JUDGMENT ENTERED IN THE |
| MACHINERY EXCHANGE CORPORATION | | COURT OF COMMON PLEAS COUNTY OF SUMMIT, OHIO CASE No.    CV-2009-04-3011 |
| Appellee | | |

DECISION AND JOURNAL ENTRY

Dated: August 22, 2012

CARR, Judge.

{¶1}    Appellants, Pelmar Engineering, Ltd., and Pelmar USA, LLC, appeal the judgment of the Summit County Court of Common Pleas which granted judgment in favor of appellee, Machinery Exchange Corporation, on all of Pelmar's claims. This Court affirms.

I.

{¶2}    Pelmar Engineering, Ltd. is a foreign corporation based in Israel and which engages in the business of buying and selling used or refurbished rubber-processing equipment. Pelmar USA, LLC was created in 2007, after the events giving rise to this action, but it assumed the rights and obligations of Pelmar Engineering in the United States. These entities will be referred to collectively as Pelmar. Jacob Peled started the business in 1966, and Lou Rabiner served as its commercial director at all times relevant to this matter.

{¶3}    Pelmar developed a working relationship with Soberay Machine and Equipment ("SME"), an American company, to facilitate its conducting business in the United States.

Initially, Pelmar worked with Ron Soberay of SME until he retired. By the time relevant to this matter, John Fry had become president of SME, and Pelmar continued its relationship with SME through him. SME also engages in the business of buying and selling rubber-processing equipment, although it focuses mainly on the acquisition and sale of rubber mixers.

{¶4} Machinery Exchange Corporation ("MEC") is owned and operated by Robert Thompson. His wife Mary handles the company's administrative work, including bookkeeping. MEC, too, is in the business of buying and selling rubber-processing equipment domestically and abroad. Mr. Thompson has known Mr. Peled since the 1970's. He has known Mr. Fry for 25 years and has dealt with him and SME over the years.

{¶5} The issues in this appeal arise out of two situations involving MEC, Pelmar, and Mr. Fry.

{¶6} In the spring of 2005, Pelmar had acquired two mixer lines (a K-7 line and an F-270 line) which consisted of numerous pieces of equipment, and it was unable to store the lines at its facility. Mr. Fry asked Mr. Thompson if he would store the mixer lines at the MEC facility as a favor to Mr. Peled. Mr. Thompson reluctantly agreed after Mr. Fry assured him that the storage was required for only a brief period because Pelmar had already found a buyer for the mixer lines. The K-7 mixer line, including a motor and other equipment, was shipped to India soon thereafter. The F-270 mixer line languished in storage at MEC for over three years until Pelmar found a buyer. When the F-270 mixer line was being prepared for shipment, it was discovered that there was no motor with the line.

{¶7} In the summer of 2005, Pelmar bought 40 presses from Bridgestone/Firestone in Oklahoma. At the same time, Mr. Fry facilitated a transaction whereby MEC would buy 11 of those presses from Pelmar for $110,000, plus costs not to include the removal of the presses from

the pits at Bridgestone/Firestone. MEC expected to pick up its presses from Bridgestone/Firestone's yard. Instead, unbeknownst to MEC, SME arranged for Industrial Equipment Service ("IES") to move and store all 40 forty presses after they were removed from the Oklahoma facility. MEC sent partial payments to Pelmar, totaling $60,000. When MEC attempted to pick up its 11 presses from the storage facility, IES refused because Pelmar had not paid the moving and storage fees. IES refused to release any presses until the entire moving and storage bill had been paid. Mr. Thompson contacted Mr. Fry who told him to pay IES for the moving and storage costs for all 40 presses and deduct that amount from the balance MEC owed Pelmar for the 11 presses. MEC paid IES approximately $40,000 and obtained its 11 presses. Mr. Fry later sent a reconciliation of MEC's account with Pelmar. MEC paid Pelmar the remaining balance pursuant to the reconciliation in February 2006.

{¶8} On April 17, 2009, Pelmar filed a complaint against MEC, alleging a claim of breach of a contract for bailment and a claim of conversion arising out of the F-270 mixer line matter; and a claim of breach of contract and a claim for unjust enrichment arising out of the presses transaction. MEC answered. The case was ultimately tried to the bench. The parties submitted post-trial briefs in lieu of closing arguments. The trial court entered judgment in favor of MEC on all of Pelmar's claims. Pelmar appealed, raising three assignment of error for review. This Court rearranges the assignments of error to facilitate review.

II.

**ASSIGNMENT OF ERROR III**

THE TRIAL COURT ERRED IN DETERMINING THAT PELMAR FAILED
TO DEMONSTRATE BY A PREPONDERANCE OF THE EVIDENCE THAT
THE F-270 MOTOR WAS DELIVERED TO MEC.

{¶9} Pelmar argues that the trial court's judgment regarding its claims for breach of a bailment contract and conversion was against the manifest weight of the evidence. This Court disagrees.

{¶10} The Ohio Supreme Court recently clarified the civil manifest weight of the evidence standard of review, holding that it mirrors the criminal standard. *Eastley v. Volkman*, Slip Opinion No. 2012-Ohio-2179. Accordingly, we apply the following review:

> When the manifest weight of the evidence is challenged, "[a]n appellate court conducts the same manifest weight analysis in both criminal and civil cases." *Ray v. Vansickle*, 9th Dist. Nos. 97CA006897 and 97CA006907, 1998 WL 716930 (Oct. 14, 1998). "'The [reviewing] court * * * weighs the evidence and all reasonable inferences, considers the credibility of witnesses and determines whether in resolving conflicts in the evidence, the [finder of fact] clearly lost its way and created such a manifest miscarriage of justice that the [judgment] must be reversed and a new trial ordered.'" *State v. Thompkins*, 78 Ohio St.3d 380, 387 (1997), quoting *State v. Martin*, 20 Ohio App.3d 172, 175 (1st Dist.1983). Moreover, "[e]very reasonable presumption must be made in favor of the judgment and the findings of facts [of the trial court]." *Karches v. Cincinnati*, 38 Ohio St.3d 12, 19 (1988). Furthermore, "if the evidence is susceptible of more than one construction, we must give it that interpretation which is consistent with the verdict * * * and judgment, most favorable to sustaining the trial court's verdict and judgment." *Id.*

*Tewarson v. Simon*, 141 Ohio App.3d 103, 115 (9th Dist.2001).

{¶11} Moreover,

> Weight of the evidence concerns the tendency of a greater amount of credible evidence to support one side of the issue more than the other. *Thompkins*, 78 Ohio St.3d at 387. Further when reversing a [judgment] on the basis that it was against the manifest weight of the evidence, an appellate court sits as a "thirteenth juror," and disagrees with the factfinder's resolution of the conflicting testimony. *Id.*

*State v. Tucker*, 9th Dist. No. 06CA0035-M, 2006-Ohio-6914, ¶ 5. This discretionary power should be exercised only in exceptional cases where the evidence presented weighs heavily in favor of the appellant and against the judgment. *Thompkins*, 78 Ohio St.3d at 387.

**{¶12}** "In order to establish a prima facie case against a bailee in an action sounding in contract, a bailor need prove only (1) the contract of bailment, (2) delivery of the bailed property to the bailee and (3) failure of the bailee to redeliver the bailed property undamaged at the termination of the bailment." *David v. Lose*, 7 Ohio St.2d 97 (1966), paragraph one of the syllabus. To prevail on a claim of conversion, a plaintiff must prove (1) that it owned or had the right to control the property at the time of the conversion, (2) the defendant's wrongful act or disposition of the plaintiff's property rights, and (3) damages. *Scott Charles Laundromat, Inc. v. Akron*, 9th Dist. No. 26125, 2012-Ohio-2886, ¶ 9. The trial court granted judgment in favor of MEC on both the bailment and conversion claims upon finding that Pelmar failed to prove by a preponderance of the evidence that the F-270 mixer motor had ever been in MEC's possession.

**{¶13}** Pelmar bought two mixer lines from a company named Robbins. The invoice from Robbins to Pelmar listed a motor with each of the two mixer lines. The equipment was consigned to Karder Machine for refurbishing. After Karder completed its refurbishing and demanded the removal of the equipment, Mr. Fry convinced Mr. Thompson to store the mixer lines at MEC as a favor to Mr. Peled and Pelmar.

**{¶14}** At trial, Mr. Fry testified that he helped arrange the transfer of the mixer lines from Karder to MEC. He admitted that the motor for the F-270 line was not transferred to MEC with the rest of the equipment, but he thought he saw the motor at a later date inside the MEC facility. Mr. Fry conceded that there should have been a bill of lading created for the transport of the equipment from Karder to MEC. He admitted that there was no bill of lading because the transport was a "last minute arrangement" with a truck driver who happened to be making a delivery to Karder. Accordingly, Mr. Fry could point to no documentary evidence to show that the motor was transported to MEC.

{¶15} Subsequently, while at MEC, Mr. Fry thought the motor was not there, and he mentioned his observation to Mr. Thompson. He testified that Mr. Thompson said he did not recall the motor ever having been in his facility. Although Mr. Fry was not certain the F-270 had ever been transported to MEC, he thought it had been. He suspected that a MEC employee named Keith had sold the motor because he knew Keith to be an alcoholic and suspected that he also used drugs. Mr. Fry explained, "[T]hose kinds of people normally need extra money." Notwithstanding Mr. Fry's suspicion that a MEC employee had sold Pelmar's F-270 motor, he did not notify Pelmar of the missing motor until three years later after Pelmar had finally arranged to sell the F-270 mixer line.

{¶16} Mr. Peled testified that there were bills of lading prepared for the transport of the mixer lines from Karder to MEC. The record contains copies of bills of lading regarding various pieces of equipment indicating the transport from Karder to SME or SME-Pelmar, although the destination address is the location of MEC. All of the bills of lading bear a date of merely "2005." None of the legible bills of lading list a motor for the F-270 line. One bill of lading lists a quantity of one each of two items but the description of the items is illegible. Another bill of lading for the transport of equipment from Robbins to Karder indicates that one motor, not two, was shipped on April 15, 2005.

{¶17} Mr. Peled testified that he was at Karder when the mixer lines were transported to MEC and he admitted that he only saw one motor. He "vaguely" remembered a second motor arriving later, but he could not say for sure that two motors were ever transferred from Karder to MEC. He thought he saw two motors at MEC two to three months later while Mr. Thompson was with him. Mr. Peled took a picture of a motor at MEC, but he could not say whether it was a motor for a K-7 mixer or an F-270 mixer.

{¶18} Upon questioning by the court, Mr. Peled offered some confusing testimony about why it took several years to find a buyer for the F-270 mixer line when Mr. Fry originally informed Mr. Thompson that both mixer lines had already been sold in the spring of 2005. Mr. Peled had inquired of MEC in August 2005, whether MEC had any F-270 mixer lines for sale because Pelmar had a customer for such equipment. Mr. Peled explained that its customer did not want to buy the F-270 line stored at MEC because the customer did not want to take a risk of buying a mixer line without a motor. However, Mr. Fry and Mr. Pelmar did not realize that the F-270 motor was "missing" until 2008.

{¶19} Daniel Abraham was the President of Karder Machine Company in 2005, when the two mixer lines were transferred from Karder to MEC. He testified that Karder transferred out of its facility in 2005, one K-7 mixer with motor and auxiliary equipment and two F-270 mixers with all equipment except the motors. He did not know where any of the lines were transported. When presented with the picture of the motor taken by Mr. Peled, Mr. Abraham testified that he had never seen that motor before and "seriously doubt[ed]" that it was an F-270 mixer motor because of its size and shape.

{¶20} Gary Boggs has been the plant manager at MEC since 2005. He testified that he is familiar with all equipment that comes onto the site. He testified that he never saw a bill of lading for the mixer lines transported to MEC from Karder, and that he was sure that only one motor arrived from Karder.

{¶21} Robert Thompson, president of MEC, testified that Mr. Fry called him in the spring of 2005, and asked if he would store some mixer lines for Pelmar as a favor to Mr. Peled. Mr. Thompson testified that Mr. Fry addressed the matter with him because everything that Pelmar did with MEC was handled by Mr. Fry. Mr. Thompson reluctantly agreed to store the

mixer lines only because Mr. Fry assured him that the lines had been sold and they would not be at MEC very long. Mr. Thompson testified that there was a motor for the K-7 mixer line and that that entire line was quickly reshipped to a customer in India. He was certain that no motor for the F-270 line was ever transported to MEC. He testified that he was outraged to learn that Mr. Peled wanted Mr. Fry to file a police report and make a claim against MEC's insurance for a motor that was never on MEC property.

{¶22} A review of the record indicates that this is not the exceptional case, where the evidence weighs heavily in favor of Pelmar. A thorough review of the record compels this Court to conclude that the trial court did not lose its way and commit a manifest miscarriage of justice in finding that the motor for the F-270 mixer line was never in MEC's possession. Both Mr. Fry and Mr. Peled admitted that the motor was not transferred with the initial shipment of equipment to MEC. Neither Mr. Fry nor Mr. Peled was certain that the second motor was ever transferred to MEC. Mr. Peled seemed to understand that MEC had not received the F-270 motor because he testified that his customer at the time did not want to buy the F-270 mixer line stored at MEC because it had no motor. No bill of lading existed to indicate the transport of a second motor to MEC. Both the plant manager and president of MEC testified that no F-270 motor was ever transferred from Karder to MEC. The weight of the evidence supports the conclusion that MEC did not breach any bailment contract or convert the motor because the evidence supports the finding that no F-270 motor was ever delivered to MEC. Accordingly, the judgment in favor of MEC is not against the manifest weight of the evidence. Pelmar's third assignment of error is overruled.

## ASSIGNMENT OF ERROR I

THE TRIAL COURT ERRED IN DETERMINING THAT JOHN FRY HAD APPARENT AUTHORITY TO BIND PELMAR WITH RESPECT TO MEC'S PAYMENT OF STORAGE FEES TO IES.

**{¶23}** Pelmar argues that the trial court failed to apply the correct law regarding apparent authority. In the alternative, Pelmar argues that the trial court's finding that Mr. Fry had apparent authority to bind Pelmar with respect to MEC's payment of storage fees to IES was against the manifest weight of the evidence. This Court disagrees.

**{¶24}** Whether the trial court applied the proper law is a legal decision which this Court reviews de novo. *Evanich v. Bridge*, 9th Dist. No. 04CA008566, 2005-Ohio-2140, ¶ 5. The proper test is enunciated in *Master Consolidated Corp. v. BancOhio Natl. Bank*, 61 Ohio St.3d 570 (1991). The trial court applied that test, and we do so here.

**{¶25}** The manifest weight of the evidence standard of review is set forth above.

**{¶26}** The Ohio Supreme Court held:

In order for a principal to be bound by the acts of his agent under the theory of apparent agency, evidence must affirmatively show: (1) that the principal held the agent out to the public as possessing sufficient authority to embrace the particular act in question, or knowingly permitted him to act as having such authority, and (2) that the person dealing with the agent knew of those facts and acting in good faith had reason to believe and did believe that the agent possessed the necessary authority.

*Master Consolidated* at syllabus. It is the acts of the principal, not the agent's acts, which implicate apparent authority. *Id.* at 576. However, "'[w]here a principal has by his voluntary act placed an agent in such a situation that a person of ordinary prudence, conversant with business usages, and the nature of the particular business, is justified in assuming that such agent is authorized to perform on behalf of his principal a particular act, such particular act having been performed the principal is estopped as against such innocent third person from denying the

agent's authority to perform it.'" *Id.*, quoting *Gen. Cartage & Storage Co. v. Cox*, 74 Ohio St. 284, 294 (1906).

{¶27} MEC bought presses from Pelmar for $110,000. MEC made a down payment of $20,000, followed by a $40,000 payment. At that time, MEC owed a balance of $50,000. MEC subsequently paid approximately $40,000 to a third party storage company (IES) to obtain release of the presses. It did so upon the direction of Mr. Fry who told Mr. Thompson that Pelmar owed the storage company and that MEC should pay the fees and deduct that amount from its $50,000 balance.

{¶28} Mr. Thompson testified that MEC, SME, and Pelmar were all in the same business, and that he was aware of a very close relationship between SME and Pelmar since the early 1980's. He testified that SME and Pelmar worked to help expand each other's business. Specifically, Mr. Peled of Pelmar represented SME overseas, while Messrs. Soberay and Fry of SME represented Pelmar's interests in the United States. Mr. Thompson described Mr. Peled and Mr. Fry as "inseparable" and described them as agents for one another.

{¶29} Mr. Thompson testified that every business deal he had with Pelmar was handled completely by Mr. Fry. Immediately prior to the transaction involving the presses, Mr. Thompson had dealt exclusively with Mr. Fry regarding the storage of mixer lines for Pelmar.

{¶30} Mr. Thompson testified that he met with both Mr. Peled and Mr. Fry in April 2005 regarding MEC's purchase of some presses from Pelmar. Mr. Peled told him that he wanted him to work through Mr. Fry on all matters because of the good working relationship each had with Mr. Fry. Although Mr. Peled denied it, Mr. Thompson testified that Mr. Peled told him that "John Fry's words are my words." He testified that MEC worked with Mr. Fry in regard to the purchase of 11 presses from Pelmar, and an August 1, 2005 email from Mr. Fry to

Mr. Peled states that "I have sold all of the 43" presses (11) to Bob Thompson for $10,000 each. He will provide a $20,000 deposit and the balance in about 60 days. We will not ship until all the money is received." Mr. Peled responded that he accepted based on Mr. Fry's judgment. Mr. Fry forwarded this series of emails to Mr. Thompson. Mr. Fry could not recall a conversation with Mr. Thompson wherein Mr. Thompson requested Mr. Peled's personal acceptance of the terms of the presses transaction, but surmised that "apparently" he had. Based on the negotiations with Mr. Fry, Mrs. Thompson typed a purchase order. Although only Mr. Peled and Mr. Thompson signed the purchase order, the order indicated the terms "as agreed Bob Thompson/John Fry/Jacob Peled[.]"

{¶31} MEC was required to make its initial payment for the presses by wire transfer. An August 4, 2005 email from Mr. Fry to Mr. Peled requested Pelmar's bank wire transfer data so MEC could forward the down payment. SME, not Pelmar, then faxed the information to Mrs. Thompson at MEC so she could transfer the money to Pelmar. Accordingly, Mr. and Mrs. Thompson worked with Mr. Fry, and not Mr. Peled, regarding financial issues surrounding the purchase of the presses from the beginning of the transaction.

{¶32} Mr. Thompson testified that he contacted Mr. Fry when IES would not release the presses to MEC. He testified that Mr. Fry first told him that IES had billed Pelmar and that he would ensure that Pelmar paid the moving and storage fees immediately. He testified that Mr. Fry subsequently told him that he conferred with Mr. Peled and that Pelmar would not be sending payment to IES and he requested that MEC pay the moving and storage fees to IES and deduct that payment amount from its remaining balance due to Pelmar. Because Mr. Fry worked with MEC on all prior aspects of the presses transaction, as well as on other transactions, MEC paid IES at Mr. Fry's direction.

{¶33} When the issue of MEC's outstanding balance arose in January 2006, Lou Rabiner, the commercial director for Pelmar, sent an email to Mr. Thompson expressing his "shock" that SME had not forwarded Pelmar's payment to IES. While Mr. Rabiner wrote that Pelmar could not become involved in any accounting between MEC and IES, he asked merely that MEC transfer to Pelmar the "remaining" $10,000 due for the presses. A $10,000 payment would have taken into consideration the $40,000 MEC paid to IES on Pelmar's behalf.

{¶34} Moreover, Mr. Fry continued to be involved in the discussions between MEC and Pelmar regarding the balance owed by MEC. Mr. Fry sent an email to Mr. Rabiner on January 17, 2006, informing him that he would meet with SME the following day to determine, in part, "which venders (sic) invoices have been paid on Pelmar's behalf." After several emails between Mr. Fry and Mr. Rabiner, Mr. Fry sent an email to Mr. Thompson on February 13, 2006, attaching a "[r]econciliation of charges between MEC & Pelmar[,]" and requesting that Mr. Thompson let him know if he approved. According to the reconciliation, MEC owed Pelmar $16,805.14, which included some additional charges for moving and storage of MEC's 11 presses, while taking into consideration amounts Pelmar owed to MEC for MEC's payment to IES as well as a loading charging relevant to the K-7 mixer line. MEC wired $16,805.14 to Pelmar. Mr. Rabiner acknowledged receipt of the payment and requested an invoice for the accounting department's records. Although Mr. Rabiner also informed Mrs. Thompson in his February 15, 2006 email that Pelmar's accounting department needed to check the accounting, Pelmar never again requested additional payment or notified MEC that it still carried a balance for the purchase of the presses. The Thompsons only became aware that Pelmar believed MEC still owed money for the presses after Pelmar filed its complaint more than three years later on April 17, 2009. Mr. Peled testified at trial that, notwithstanding its belief that MEC still owed

$50,000 for the presses, Pelmar continued to do "quite substantial" business with MEC in the intervening years between the reconciliation of payment and Pelmar's lawsuit.

{¶35} Although Mr. Peled testified that Mr. Fry had no authority to enter into contracts or modify terms on behalf of Pelmar, he admitted that Pelmar let SME handle the mixer line matter with MEC on its behalf. He further admitted that Mr. Thompson knew that SME was involved in its business because SME was working for Pelmar. Accordingly, Mr. Peled knew that Mr. Thompson believed that Mr. Fry of SME had authority to act on Pelmar's behalf in business dealings. Mr. Peled testified that Mr. Fry prepared the reconciliation of accounts between MEC and Pelmar and that Pelmar never agreed to it. However, Pelmar accepted the amount paid by MEC based on that reconciliation of accounts and never contacted MEC to inform it that there was a remaining balance. Significantly, Mr. Peled testified that, had SME repaid Pelmar for the payment Pelmar sent to SME for forwarding to IES for moving and storage fees, "then we would not be sitting here, not for this amount." In addition, Mr. Peled admitted that Pelmar filed suit against MEC in part because it believed that Mr. Thompson played a role in a federal lawsuit filed against Pelmar although MEC was not a party to that lawsuit.

{¶36} Mr. Fry testified that he was never an employee of Pelmar during the time relevant to the presses transaction. He asserted that he had an "informal relationship" in which he had worked "on a cooperative basis" with Mr. Peled for 15 years. He testified that he was working with Bridgestone/Firestone in Oklahoma in cooperation with Mr. Peled to buy presses and that Pelmar did buy those presses. He admitted that he was charged with "facilitating" the presses transaction, meaning "doing what was necessary to make sure that the presses got sold[.]" He further testified that he subsequently spoke with Mr. Thompson regarding the sale of 11 of those presses to MEC. He acknowledged that he sent Pelmar's contact information for

payment purposes to MEC on SME letterhead. Mrs. Thompson wired MEC's payments for the presses to Pelmar based on the contact information provided by Mr. Fry, and Pelmar accepted and credited those payments.

{¶37} Mr. Fry testified that he did not know if he was Pelmar's "agent" in regard to the presses transaction, but he testified he acted "as a representative * * * of Pelmar" in regard to that transaction. Moreover, he testified that he believed that he had the authority from Pelmar to represent to MEC that its payment to IES would be credited against the balance MEC owed to Pelmar for the presses.

{¶38} A review of the record indicates that this is not the exceptional case, where the evidence weighs heavily in favor of Pelmar. A thorough review of the record compels this Court to conclude that the trial court did not lose its way and commit a manifest miscarriage of justice in finding that Mr. Fry had apparent authority from Pelmar to direct MEC to pay IES for the moving and storage fees associated with all 40 presses and to deduct that payment from the balance it owed Pelmar for the 11 presses.

{¶39} Pelmar had used Mr. Fry and SME to act on its behalf in regard to business transactions in the United States for many years. Mr. Thompson dealt exclusively with Mr. Fry in regard to the storage of Pelmar's mixer lines immediately prior to the presses transaction. Historically, Mr. Thompson knew that he would be dealing with Mr. Fry whenever he had business with Pelmar. Mr. Peled testified that he used Mr. Fry in part because he understood that American companies were hesitant to work directly with a foreign business. The Thompsons turned to Mr. Fry when issues arose regarding the presses deal, and Mr. Fry addressed all those issues. Pelmar did not object to the Thompsons' reliance on Mr. Fry's directions in regard to any issue except for the crediting of MEC's payment to IES against MEC's balance with Pelmar, and

then only years later when Mr. Peled believed that Mr. Thompson was somehow involved in other litigation against Pelmar even though MEC was not a party to that lawsuit. Under these facts, the weight of the evidence supports the conclusion that Pelmar held Mr. Fry out to the public as possessing sufficient authority to direct MEC to pay IES and deduct that amount from its balance owed to Pelmar.

{¶40} Moreover, Pelmar knowingly permitted Mr. Fry to act as having such authority when it accepted MEC's final payment based on the reconciliation of accounts as determined by Mr. Fry. Furthermore, Mr. and Mrs. Thompson knew that Mr. Fry worked on behalf of Pelmar and dealt with him in that regard for 15 years because Mr. Peled placed Mr. Fry in that position. The Thompsons were, therefore, justified in assuming that Mr. Fry was authorized to act on behalf of Pelmar in directing MEC to pay IES and deduct that amount from its debt to Pelmar. MEC paid approximately $40,000 to IES for Pelmar's obligation for moving and storing 40 presses when MEC only owned 11 of those presses and had been led to believe that the presses would remain at Bridgestone/Firestone for pickup so there would not be any moving or storage fees. Based on the above, the weight of the evidence supports the conclusion that MEC reasonably believed that Mr. Fry had authority to authorize the credit of its payment of Pelmar's obligation against its remaining balance for the presses. Accordingly, the judgment is not against the manifest weight of the evidence. Pelmar's first assignment of error is overruled.

## ASSIGNMENT OF ERROR II

THE TRIAL COURT ERRED IN FINDING THAT PELMAR RATIFIED THE ACTIONS OF JOHN FRY WITH RESPECT TO MEC'S PAYMENT OF THE STORAGE FEES TO IES AND THAT PELMAR WAS THEREBY BOUND TO MR. FRY'S ACTIONS.

{¶41} Pelmar argues that the trial court erred by finding in the alternative that, if Mr. Fry did not have apparent authority to act on behalf of Pelmar, Pelmar ratified Mr. Fry's act of

directing MEC to pay IES. "Ratification * * * [is] the approval by act, word, or conduct of that which was improperly done." *Paterson v. Equity Trust Co.*, 9th Dist. No. 11CA009993, 2012-Ohio-860, ¶ 21, quoting *AFCO Credit Corp. v. Brandywine Ski Ctr., Inc.*, 81 Ohio App.3d 217, 221 (9th Dist.1992). In other words, "[a] principal may ratify the unauthorized acts of his agent[.]" *Paterson* at ¶ 21. Because we have already concluded that the trial court did not err by finding that Mr. Fry had apparent authority to direct MEC to pay IES and deduct that amount from its debt to Pelmar, Mr. Fry's act was not improper or unauthorized. Accordingly, we decline to address the second assignment of error as it has been rendered moot. *See* App.R. 12(A)(1)(c).

## III.

**{¶42}** Pelmar's first and third assignments of error are overruled. We decline to address the second assignment of error. The judgment of the Summit County Court of Common Pleas is affirmed.

Judgment affirmed.

———

There were reasonable grounds for this appeal.

We order that a special mandate issue out of this Court, directing the Court of Common Pleas, County of Summit, State of Ohio, to carry this judgment into execution. A certified copy of this journal entry shall constitute the mandate, pursuant to App.R. 27.

Immediately upon the filing hereof, this document shall constitute the journal entry of judgment, and it shall be file stamped by the Clerk of the Court of Appeals at which time the period for review shall begin to run. App.R. 22(C). The Clerk of the Court of Appeals is

instructed to mail a notice of entry of this judgment to the parties and to make a notation of the mailing in the docket, pursuant to App.R. 30.

    Costs taxed to Appellants.

                              _____
                              DONNA J. CARR
                              FOR THE COURT

MOORE, P.J.
BELFANCE, J.
CONCUR

APPEARANCES:

MARK W. BERNLOHR, Attorney at Law, and SARAH B. BAKER, Attorney at Law, for Appellants.

HAMILTON DESAUSSURE, JR., Attorney at Law, for Appellee.