[Cite as *Trogdon v. Beltran*, 2016-Ohio-5285.]

STATE OF OHIO        )              IN THE COURT OF APPEALS
                       )ss:           NINTH JUDICIAL DISTRICT
COUNTY OF LORAIN   )

MATTHEW TROGDON                C.A. No.     15CA010809

     Appellee

     v.                              APPEAL FROM JUDGMENT
                                   ENTERED IN THE
NICHOLAS BELTRAN              COURT OF COMMON PLEAS
                                   COUNTY OF LORAIN, OHIO
     Defendant               CASE No.    10CV166513

     and

ARCH ABRAHAM NISSAN

     Appellant

DECISION AND JOURNAL ENTRY

Dated: August 8, 2016

---

MOORE, Presiding Judge.

**{¶1}** Defendant-Appellant Arch Abraham Nissan ("Nissan") appeals from the judgments of the Lorain County Court of Common Pleas. We affirm in part and reverse in part.

I.

**{¶2}** Plaintiff-Appellee Matthew Trogdon suffers from schizoaffective disorder. Because of the effects of that disorder, he became unable to work and applied for government benefits. He received a lump sum payment from Social Security and also began to receive monthly payments thereafter. His mother, Theresa Sadowski, became the representative payee

for the government benefits, and thus managed Mr. Trogdon's finances. Mr. Trogdon resided with his mother and grandmother.

{¶3} In order to spend down the lump sum payment, in early 2009, Mr. Trogdon's mother allowed him to purchase a new 2009 Jeep Patriot for approximately $24,000. The car was paid for in cash and was titled in Mr. Trogdon's name. According to his mother, Mr. Trogdon was easily influenced and began to befriend the wrong kind of people. She believed one of those people was Defendant Nicholas Beltran.

{¶4} Mr. Trogdon met Mr. Beltran at one of Mr. Trogdon's friend's houses in the fall of 2009, and the two quickly became friends. Mr. Trogdon and Mr. Beltran would see each other nearly daily, and Mr. Beltran stayed over at Mr. Trogdon's mother's house approximately 5 days a week. According to Mr. Trogdon they would drive around during the day and visit friends in Mr. Trogdon's Jeep. They began to drive around so much that Mr. Trogdon would spend more money each week on gas than he could afford based upon the amount of government benefits he received. Thereafter, Mr. Trogon's mother locked the vehicle in the garage and prevented Mr. Trogdon from having access to it.

{¶5} According to Mr. Trogdon, Mr. Beltran and Mr. Beltran's godfather, Bernie Hall, concocted a plan to get the car back. Mr. Trogdon would sign the title over to Mr. Beltran, Mr. Beltran would get the car out, and then Mr. Beltran would sign the title back over to Mr. Trogdon. On January 29, 2010, Mr. Trogdon went with Mr. Beltran and signed the car over to Mr. Beltran. Mr. Trogdon did not tell his mother about the transfer. Shortly thereafter, Mr. Trogdon's mother allowed the two to take the car out so that they could "check some tires[]" for Mr. Beltran's godfather. Instead of doing that, however, Mr. Beltran drove the Jeep to a Giant Eagle and dropped Mr. Trogdon off. Mr. Beltran told Mr. Trogdon that Mr. Beltran's

grandmother was in Giant Eagle and had $400 for him and that Mr. Trogdon was to find her and get the money. When Mr. Trogdon could not find Mr. Beltran's grandmother, he proceeded back to the parking lot to discover that Mr. Beltran had left.

{¶6} Mr. Trogdon called his mother and told her that Mr. Beltran took the car and that Mr. Trogdon transferred the title to Mr. Beltran. Mr. Trogdon's mother picked him up and they proceeded to the police station to report the vehicle stolen. Ultimately, the police informed them that it was a civil matter. Mr. Trogdon's mother contacted a lawyer who contacted a few dealerships in the area.

{¶7} Mr. Beltran attempted to trade the vehicle in at a Kia dealership; however, the salesperson at the Kia dealership was suspicious and declined to complete the transaction. Ultimately, on January 31, 2010, Mr. Beltran traded the Jeep in at Nissan for a 2004 Nissan Sentra and a check for $2,348.84. The trade-in value of the Jeep was $10,500. The day after the sale, Mr. Trogdon's mother contacted Nissan, and Nissan informed her that it had the vehicle and that it was titled to Mr. Beltran. Mr. Trogon's mother asked Nissan to hold the vehicle, and Nissan agreed to do so for a week. Mr. Trogdon's attorney also contacted Nissan and explained the situation and asked it to hold the vehicle. Additionally, on February 6, 2010, the attorney faxed a letter to Nissan informing it of the situation and asking Nissan to not sell or transfer the Jeep.

{¶8} Mark Heinowski went to Nissan sometime after Mr. Beltran had traded in the Jeep. Mr. Heinowski was looking to purchase a Jeep and noticed the Jeep at issue on the lot. Nothing indicated it was not for sale. However, he left without purchasing the vehicle. He returned on February 13, 2010 and found a "Do not sell" sign on the Jeep. When he inquired about it, he was told that the car was being held for a relative of the owner. Nonetheless, Mr.

Heinowski took it for a test drive and, after the sales staff talked to a couple of people, Nissan sold Mr. Heinowski the Jeep for a purchase price of $16,045. Michael Abraham, a part owner of Nissan, explained that he spoke with the police about the vehicle, and the police told him that he was free to sell the vehicle.

{¶9} In March 2010, Mr. Trogdon filed a complaint against Mr. Beltran and Nissan. That complaint was amended to add Mr. Heinowski as a Defendant. Thereafter, Mr. Heinowski answered and filed cross-claims against Mr. Beltran and Nissan. In June 2010, Mr. Trogdon filed a second amended complaint. Therein he asserted claims for fraud, conversion, and unjust enrichment against Mr. Beltran, fraud, conversion, and negligence against Nissan, and replevin against Mr. Heinowski. Nissan also filed a cross-claim against Mr. Beltran seeking indemnity.

{¶10} Ultimately, the claims against Mr. Heinowski were dismissed, and Mr. Heinowski dismissed his cross-claims. Mr. Trogdon was granted a default judgment against Mr. Beltran with damages awarded in the amount of $17,000. The matter proceeded to a bench trial and the trial court found in favor of Mr. Trogdon for $16,045. The trial court concluded that Mr. Beltran obtained the Jeep by fraud, that Nissan had notice that Mr. Beltran was not a bona fide purchaser, that Nissan was not a bona fide purchaser, and that Nissan converted the Jeep for its own use by reselling it. The trial court found Nissan and Mr. Beltran jointly and severally liable and in addition to the damages award, determined that Mr. Trogdon was entitled to an award of costs and an award of reasonable attorney fees.

{¶11} Nissan appealed and this Court dismissed the appeal concluding the entry appealed was not final and appealable because the trial court failed to determine the amount of attorney fees to be awarded. *See Trogdon v. Beltran* ("*Trogdon I*"), 9th Dist. Lorain No. 13CA010396 (July 8, 2013). While the matter was pending on appeal, the trial court held a

hearing on the amount of attorney fees and issued a judgment entry awarding fees. While the matter was still on appeal, the trial court reconsidered the amount of the award. Nissan appealed again arguing that the trial court lacked jurisdiction to issue an award of attorney fees while the first appeal was pending. This Court determined that because Nissan's first appeal was pending, "the trial court did not thereafter have jurisdiction to issue a judgment determining the amount of the attorney fees." *Trogdon v. Beltran* ("*Trogdon II*")*,* 9th Dist. Lorain No. 13CA010446, 2015-Ohio-1256, ¶ 9. We further concluded that the May 13, 2013 and June 20, 2013 orders awarding attorney fees were nullities that must be vacated. *See id.*

{¶12} Upon remand, a new trial judge heard the matter. Thereafter, the trial court awarded Mr. Trogdon $57,319.50 in attorney fees. Nissan has appealed, raising five assignments of error for our review.

II.

{¶13} Prior to addressing the merits of the assignments of error, we pause to address Mr. Trogdon's assertion that Nissan's first through fourth assignments of error are barred by res judicata. Mr. Trogdon asserts that, because Nissan failed to challenge the merits of the trial court's original verdict in the second appeal, Nissan is barred by res judicata from raising those issues now.

{¶14} We previously determined that the trial court's original entry awarding judgment for Mr. Trogdon was not final and appealable because it failed to determine an amount of attorney fees. *See Trogdon I.* Additionally, we determined in *Trogdon II* that the trial court's entries awarding an amount of attorney fees were nullities. *Trogdon II* at ¶ 9. Accordingly, the original judgment did not become final and appealable until the trial court issued the June 15, 2015 entry that is currently being appealed. *See Dunkle v. Children's Hosp. Med. Ctr. of Akron,*

9th Dist. Summit No. 26612, 2013-Ohio-5555, ¶ 34 ("[R]es judicata and the law of the case doctrine require a final order."). Thus, had Nissan raised assignments of error related to the merits in *Trogdon II,* we would have been unable to address them. *See Trogdon II* at ¶ 6 (noting that "this Court lacks jurisdiction to consider nullities[]"). Therefore, Mr. Trogon has not convinced us that res judicata has any application here, and we proceed to address the merits of Nissan's arguments.

III.

**ASSIGNMENT OF ERROR I**

THE TRIAL COURT'S JUDGMENT FINDING [NISSAN] WAS LIABLE TO [MR.] TRO[GD]ON FOR THE CONVERSION OF A 2009 JEEP WAS NOT SUPPORTED BY SUFFICIENT EVIDENCE.

**{¶15}** Nissan argues in its first assignment of error that the trial court's finding in favor of Mr. Trogdon on his conversion claim was based upon insufficient evidence. Nissan has limited its argument to the issue of whether Mr. Trogdon is estopped from claiming ownership of the Jeep.

**{¶16}** "When a defendant argues that the judgment in a civil case is supported by insufficient evidence, we must determine whether, viewing the evidence in the light most favorable to the plaintiff, a reasonable trier of fact could find in favor of the plaintiff." *Baaron, Inc. v. Davidson,* 9th Dist. Wayne No. 13CA0050, 2015-Ohio-4217, ¶ 13, quoting *Lubanovich v. McGlocklin,* 9th Dist. Medina No. 12CA0090-M, 2014-Ohio-2459, ¶ 8.

**{¶17}** "Conversion is 'the wrongful exercise of dominion over property to the exclusion of the rights of the owner, or withholding it from his possession under a claim inconsistent with his rights.'" *Allan Nott Ents., Inc. v. Nicholas Starr Auto, L.L.C.,* 110 Ohio St.3d 112, 2006-Ohio-3819, ¶ 36, quoting *Joyce v. Gen. Motors Corp.*, 49 Ohio St.3d 93, 96 (1990). "To prevail

on a claim of conversion, a plaintiff must prove (1) that it owned or had the right to control the property at the time of the conversion, (2) the defendant's wrongful act or disposition of the plaintiff's property rights, and (3) damages." *Pelmar USA, L.L.C. v. Mach. Exchange Corp.,* 9th Dist. Summit No. 25947, 2012-Ohio-3787, ¶ 12.

{¶18} "R.C. 4505.04 provides that a person must possess a certificate of title to claim ownership of a motor vehicle." *Allan Nott* at ¶ 15. "[T]he purpose of Ohio's Certificate of Title Act is [t]o prevent the importation of stolen motor vehicles and thefts and frauds in the transfer of title to motor vehicles." (Emphasis omitted.) (Internal quotations and citation omitted.) *Id.* at ¶ 34. While "Ohio's Certificate of Motor Vehicle Title Act grants a unique status to an individual who has in his possession a certificate of origin[;] * * * the rights it creates in a holder of such a certificate are not absolute and the holder does not prevail against all the world under any and all circumstances." (Internal quotations and citations omitted.) *Id.* at ¶ 16. "Under the provisions of the Ohio Certificate of Motor Vehicle Title Act, absent any question of estoppel arising from an act of the owner, a thief cannot convey valid title to a stolen motor vehicle to a bona fide purchaser for value without notice, although the certificate of title used in the purported transfer appears valid on its face." *Hardware Mut. Cas. Co. v. Gall,* 15 Ohio St.2d 261 (1968), paragraph 3 of the syllabus; *see also Allan Nott* at ¶ 41 (reaffirming holding in *Gall*). Moreover, "for purposes of the Certificate of Title Act, 'stolen motor vehicle' includes motor vehicles that are stolen by fraud or deception." *Allan Nott* at ¶ 41.

{¶19} At the conclusion of the bench trial, the trial court summarized the issues as being (1) whether Mr. Beltran defrauded Mr. Trogdon; and (2) whether based upon the transaction and knowledge Nissan had, should Nissan have suspected something was not right with the transaction between it and Mr. Beltran. The parties agreed that those were the issues before the

trial court. The trial court requested post-trial briefs on the issues, which both sides submitted. In Mr. Trogdon's post-trial brief, he raised the issue of whether he was estopped from claiming ownership of the vehicle and argued that his actions of reporting the claim to the police and retaining counsel were consistent with his claims against Nissan. Thus, he maintained that he was not estopped from claiming ownership.

{¶20} In Nissan's post-trial brief, filed after Mr. Trogdon's brief, Nissan did not raise the issue of estoppel or respond to Mr. Trogdon's claim that his actions were consistent with his claim that the car belonged to him. Instead, Nissan stated that, "[i]f the Court finds that [Mr.] Trogdon was deceived into signing over title to the vehicle by [Mr.] Beltran then [*Allan Nott*] applies and of course, [Nissan] received a certificate of title that was procured by theft, and [Nissan] would be responsible for the value of the car."

{¶21} Under these particular circumstances, we conclude that Nissan has, at the very least, forfeited any argument that Mr. Trogdon was estopped from claiming ownership of the vehicle. *See Brunke v. Ohio State Home Servs., Inc.,* 9th Dist. Lorain No. 13CA010500, 2015-Ohio-2087, ¶ 47 ("It is axiomatic that a litigant who fails to raise an argument in the trial court forfeits his right to raise that issue on appeal.") (Citations omitted.) While Nissan could still argue plain error, Nissan has not done so, and we are not inclined to create a plain error argument on its behalf. *See id.*

{¶22} As Nissan's argument under this assignment of error was limited to the issue of estoppel and it failed to preserve that issue, we overrule its first assignment of error on that basis. *See* App.R. 16(A)(7).

## ASSIGNMENT OF ERROR II

THE TRIAL COURT'S JUDGMENT FINDING [NISSAN] WAS LIABLE TO [MR.] TROGDON FOR THE CONVERSION OF A 2009 JEEP WAS AGAINST THE MANIFEST WEIGHT OF THE EVIDENCE.

{¶23}  Nissan argues in in its second assignment of error that the trial court's verdict for Mr. Trogdon on his conversion claim was against the manifest weight of the evidence. Specifically, Nissan asserts that the weight of the evidence does not support the conclusion that Mr. Beltran obtained title to the Jeep via fraud.[1]

{¶24}  In determining whether a trial court's ruling is against the weight of the evidence:

The [reviewing] court * * * weighs the evidence and all reasonable inferences, considers the credibility of witnesses and determines whether in resolving conflicts in the evidence, the [finder of fact] clearly lost its way and created such a manifest miscarriage of justice that the [judgment] must be reversed and a new trial ordered.

(Internal quotations and citations omitted.)  *Eastley v. Volkman*, 132 Ohio St.3d 328, 2012-Ohio-2179, ¶ 20.  "In weighing the evidence, the court of appeals must always be mindful of the presumption in favor of the finder of fact."  *Id.* at ¶ 21.

{¶25}  The trial court in its original judgment entry determined that Mr. Beltran obtained title to the Jeep via fraud.  As stated above, "[u]nder the provisions of the Ohio Certificate of Motor Vehicle Title Act, absent any question of estoppel arising from an act of the owner, a thief cannot convey valid title to a stolen motor vehicle to a bona fide purchaser for value without notice, although the certificate of title used in the purported transfer appears valid on its face."  *Gall,* 15 Ohio St.2d 261, at paragraph 3 of the syllabus.  "[F]or purposes of the Certificate of Title Act, 'stolen motor vehicle' includes motor vehicles that are stolen by fraud or deception."

---

[1] While Nissan also *mentions* that Mr. Trogdon was estopped from claiming an ownership interest, it offers no argument on the issue based upon credibility or conflicts in the evidence.  Accordingly, it appears that Nissan is reasserting a sufficiency argument which we have already resolved in the first assignment of error.

*Allan Nott,* 110 Ohio St.3d 112, 2006-Ohio-3819, at ¶ 41. Accordingly, Nissan's argument would fail if the record supported that Mr. Beltran stole the Jeep via either fraud or deception.

**{¶26}** Nissan bases its argument on conflicts in the evidence, essentially asserting that the weight of the evidence supports the conclusion that Mr. Trogdon willingly transferred title to the Jeep to Mr. Beltran, either to avoid having the vehicle seized due to Mr. Trogdon's involvement in an aggravated robbery or to repay Mr. Beltran money Mr. Beltran alleged Mr. Trogdon owed him. Additionally, Nissan argues that the weight of the evidence does not support the conclusion that Mr. Trogdon was easily susceptible to manipulation. Accordingly, Nissan's argument is based upon factual determinations, not upon legal theories or definitions.

**{¶27}** The trial testimony revealed that, following graduation from high school, Mr. Trogdon worked for Contour Tool and then Polycase until he was diagnosed with schizoaffective disorder in approximately 2002. The disorder caused Mr. Trogdon to have paranoid thoughts and hear voices. His condition prevented him from holding steady employment and he applied for Social Security benefits, which he was ultimately awarded. Those payments were made to his mother, as his representative payee, because Mr. Trogdon, in light of his mental condition, was not able to manage his finances to support his everyday needs. Mr. Trogdon did not have access to the funds and would have to ask his mother if he needed anything. At the time of trial, Mr. Trogdon testified that he was attending community college, that he had been sober for a year and a half, and that his medications seemed to finally be working well.

**{¶28}** Mr. Trogdon's mother testified that he was easily influenced and that, since he was diagnosed with schizoaffective disorder, he did not have a lot of friends. She asserted that Mr. Trogdon started hanging out with the "[w]rong group of friends." Mr. Trogdon's mother testified that she believed that this caused him to get into trouble. Mr. Trogdon admitted to

having prior convictions, including possession of marijuana, possession of cocaine, and aggravated robbery. He stated that he made bad choices, his reasoning was cloudy, and, because he wanted to fit in, he tended to do what people asked of him.

{¶29} Mr. Trogdon befriended Mr. Beltran in the fall of 2009. Mr. Trogdon admitted that he and Mr. Beltran smoked marijuana daily and spent the days driving around in Mr. Trogdon's Jeep. Mr. Trogdon testified that Mr. Beltran knew about his disorder, but Mr. Beltran denied the same. Mr. Trogdon's mother testified that Mr. Beltran tried to convince Mr. Trogdon that there was nothing wrong with him and that he did not need the medications he was taking.

{¶30} In 2009, Mr. Trogdon was involved in an aggravated robbery of a neighbor's house. Mr. Trogdon waited in the car while other individuals went in and robbed the neighbor. Mr. Trogdon testified that, after the robbery, Mr. Beltran and his godfather became concerned for Mr. Trogdon that the police would confiscate the Jeep because of the aggravated robbery case. Thus, they began formulating a plan to put the Jeep in Mr. Beltran's name. However, according to Mr. Trogdon, once his mother locked the Jeep in the garage, the plan changed to one where, after the title was signed over to Mr. Beltran and Mr. Beltran got the vehicle out of the garage, Mr. Beltran would sign the vehicle back over to Mr. Trogdon. Mr. Trogdon denied owing Mr. Beltran any money.

{¶31} Prior to transferring the car to Mr. Beltran, Mr. Trogdon and Mr. Beltran went to the police station with the title and attempted to get the police to help Mr. Trogdon get the Jeep out of the garage. The police took them back to the house and told them they should "call it a night."

{¶32} Mr. Trogdon testified that in January 2010, he and Mr. Beltran went in another vehicle to an Ohio Bureau of Motor Vehicles office where Mr. Trogdon transferred the title over

to Mr. Beltran. Mr. Trogdon indicated that Mr. Beltran told him to mark the transfer as a gift. The mileage listed on the title assignment form was 18,152 miles; however, the odometer reading noted at Nissan indicated that vehicle actually had 18,001 miles when Nissan purchased it from Mr. Beltran. Mr. Trogdon testified that, at the time of the transaction, he was not thinking clearly.

{¶33} Shortly thereafter, Mr. Trogdon's mother, who was unaware of the title transfer, allowed Mr. Trogdon and Mr. Beltran to take the Jeep out to go over to Mr. Beltran's godfather's house. Instead, of going there, however, Mr. Beltran drove them to Giant Eagle and told Mr. Trogdon that Mr. Beltran's grandmother was inside and that she had money for Mr. Beltran. Mr. Trogon went inside, but was unable to find Mr. Beltran's grandmother. When Mr. Trogdon returned to the parking lot, Mr. Beltran was gone.

{¶34} Mr. Beltran, who also had prior convictions, including tampering with evidence, theft, forgery, and receiving stolen property, testified to a different version of events. Mr. Beltran testified that Mr. Trogdon owed Mr. Beltran approximately $7,200, and that is why Mr. Trogdon signed the title over to Mr. Beltran. Mr. Beltran could not really explain why they indicated on the form that the transfer of the vehicle was a gift. Mr. Beltran testified that after the transfer of the title, Mr. Trogdon's mother let them take the car out and they went to Mr. Beltran's house, then possibly Mr. Beltran's godfather's house, and then to Giant Eagle. According to Mr. Beltran, Mr. Trogdon wanted to be dropped off at the Giant Eagle as he was meeting someone there. Mr. Beltran indicated that he was not supposed to wait for Mr. Trogdon.

{¶35} According to Captain Anthony Campo of the Sheffield Lake Police Department, during his investigation, Mr. Beltran provided Captain Campo with a handwritten note which indicated that Mr. Beltran was receiving the Jeep in exchange for the money Mr. Trogdon owed

Mr. Beltran. That note bore two signatures, purporting to be those of Mr. Trogdon and Mr. Beltran. Mr. Beltran admitted to drafting the top portion of the document.

{¶36} Mr. Trogdon denied signing the document and denied seeing it prior to police showing it to him. Mr. Trogdon noted that it appeared his signature was improperly spelled as "Trogden" as opposed to "Trogdon." When Mr. Trogdon was shown the document, he told the police that the signature looked like his but was not his. Captain Campo, however, testified that Mr. Trogdon told Captain Campo that Mr. Trogdon did sign the document.

{¶37} Mr. Beltran testified that he did not even really want the Jeep because it "didn't drive good[]" due it previously being involved in an accident. Thus, he sought to trade it in. The day after dropping Mr. Trogdon off at the Giant Eagle, Mr. Beltran went with a friend to the Kia dealership. They arrived at the dealership just after it had closed for the day. Mr. Beltran did not have a driver's license or insurance on the vehicle and had Mr. Trogdon's license plates on the vehicle. The salesperson at the Kia dealership testified that he declined to do business with Mr. Beltran as he found the circumstances of the transaction suspicious: namely that the mileage on the odometer was less than that on the title, that the title was new, and that Mr. Beltran did not have a driver's license or proof of insurance. Mr. Beltran also indicated that the Kia dealership refused to buy the Jeep because the license plates did not match the title.

{¶38} Mr. Beltran testified that, upon leaving the dealership, someone from the dealership called the police and he was pulled over. The police told him that the title did not match the plates and that he needed to put his plates on the vehicle. After that encounter, Mr. Beltran spoke to his friend who worked at a towing company. His friend gave him dealer plates to put on the Jeep. Thus, when Mr. Beltran took the vehicle to Nissan, it had both Mr. Trogdon's plates on it and the dealer plates.

{¶39} Mr. Beltran testified that he told the salespeople at Nissan that he was looking to buy a cheap car and so they showed him the cheapest ones they had. He told Nissan that he did not have a driver's license, only a state identification card. He also informed Nissan of the odometer mileage issue and Nissan indicated that it was not a problem. According to Mr. Beltran, the salespeople at Nissan also inquired about the license plates and asked why he had someone else's license plates on his car. Nonetheless, ultimately, Nissan allowed Mr. Beltran to trade in the 2009 Jeep for a 2004 Nissan Sentra with almost 90,000 miles on it and a check for $2,348.84.

{¶40} Mr. Abraham, a part owner of Nissan, testified that he remembered the transaction with Mr. Beltran and signed off on some of the paperwork. He did not recall the salespeople bringing any issues with the vehicle to his attention. Mr. Abraham was not informed of any discrepancy between the mileage listed on the title and the mileage on the vehicle, nor did he recall any discussion about whether Mr. Beltran had a license or insurance. Mr. Abraham indicated that he became concerned about the discrepancy in the mileage only after he learned that there could be a problem with the transaction. However, he also testified that it was common for the mileage listed on the title to not always match the mileage on the vehicle. Mr. Abraham testified that he did not notice any dealer plates on the vehicle and no one brought that to his attention. Additionally, he averred that no one at the dealership would have researched to see if the plates were registered to Mr. Beltran.

{¶41} After an independent review of the record, we cannot say that the trier of fact lost its way in finding Mr. Trogdon's version of events more credible than Mr. Beltran's. The trial court was aware of Mr. Trogdon's mental health issues and the fact that his mother managed all of his finances. There was also testimony that Mr. Beltran knew of Mr. Trogdon's illness and

testimony that Mr. Trogdon was easily influenced and tried to please people. Mr. Trogdon, who, at the time of trial, was functioning well enough to attend community college, testified that he agreed to transfer the title to Mr. Beltran so that they could get the Jeep out of the garage. Once the Jeep was out of the garage, Mr. Trogdon averred that Mr. Beltran agreed to sign the title back over to Mr. Trogdon. However, Mr. Beltran never signed the title back to Mr. Trogdon, and instead, proceeded to try to sell the vehicle. Mr. Trogdon denied that he owed Mr. Beltran any money and he denied seeing or signing the handwritten document that Mr. Beltran asserted evidenced the purpose of the transfer of the Jeep. The trial court was able to examine the title transfer document as well as the handwritten document and use those documents to determine whether it believed that Mr. Trogdon signed the handwritten document. The trial court was also aware that, despite Mr. Beltran's claim that Mr. Trogdon owed Mr. Beltran money, the title transfer paperwork indicated that the transfer was a gift. Finally, the trial court was aware of the criminal histories of both Mr. Trogdon and Mr. Beltran and could take that information into account in evaluating their credibility.

{¶42} If Mr. Trogdon's version of events is believed, it would not be unreasonable for the trial court to conclude that Mr. Beltran deceived Mr. Trogdon into signing the title over to Mr. Beltran. This Court recognizes that "the trier of fact is in the best position to determine the credibility of witnesses and evaluate their testimony accordingly." (Internal quotations and citation omitted.) *State v. Tabassum,* 9th Dist. Summit No. 25568, 2011-Ohio-6790, ¶ 26. "It is well-settled that the [trier of fact] is free to believe all, part, or none of the testimony of each witness." (Internal quotations and citation omitted.) *State v. Bulls,* 9th Dist. Summit No. 27029, 2015-Ohio-276, ¶ 24. In light of the record before us, we cannot say that the trial court created a manifest miscarriage of justice in concluding that Mr. Beltran was a thief under the Ohio

Certificate of Motor Vehicle Title Act. *See Gall,* 15 Ohio St.2d 261, at paragraph 3 of the syllabus; *Allan Nott,* 110 Ohio St.3d 112, 2006-Ohio-3819, at ¶ 41.

**{¶43}** Given the foregoing, and Nissan's limited argument on this point, we overrule its second assignment of error.

### ASSIGNMENT OF ERROR III

THE TRIAL COURT'S JUDGMENT FINDING [NISSAN] WAS JOINTLY AND SEVERALLY LIABLE TO [MR.] TROGDON WAS NOT SUPPORTED BY SUFFICIENT EVIDENCE.

**{¶44}** Nissan argues in its third assignment of error that the trial court erred in determining that Nissan and Mr. Beltran were jointly and severally liable to Mr. Trogdon. We note that it is unclear what precisely Nissan believes the trial court should have found instead. We presume that Nissan wanted the trial court to find that there was proportionate liability, however, it has not specified what remedy it believes is appropriate. *See* App.R. 16(A)(7), (8).

**{¶45}** In its argument, Nissan relies on case law existing prior to R.C. 2307.22, which is the statute that provides a framework for determining the appropriateness of joint and several liability in tort cases.

**{¶46}** R.C. 2307.22(A) provides:

Subject to sections 2307.23 and 2307.24 and except as provided in division (B) of section 2307.70, division (B) of section 4507.07, section 4399.02, or another section of the Revised Code that expressly establishes joint and several tort liability for specified persons, joint and several tort liability shall be determined as follows:

(1) In a tort action in which the trier of fact determines that two or more persons proximately caused the same injury or loss to person or property or the same wrongful death and in which the trier of fact determines that more than fifty per cent of the tortious conduct is attributable to one defendant, that defendant shall be jointly and severally liable in tort for all compensatory damages that represent economic loss.

(2) If division (A)(1) of this section is applicable, each defendant who is determined by the trier of fact to be legally responsible for the same injury or loss

to person or property or the same wrongful death and to whom fifty per cent or less of the tortious conduct is attributable shall be liable to the plaintiff only for that defendant's proportionate share of the compensatory damages that represent economic loss. The proportionate share of a defendant shall be calculated by multiplying the total amount of the economic damages awarded to the plaintiff by the percentage of tortious conduct as determined pursuant to section 2307.23 of the Revised Code that is attributable to that defendant.

(3) *In a tort action in which the trier of fact determines that two or more persons proximately caused the same injury or loss to person or property or the same wrongful death and in which the trier of fact determines that fifty per cent or less of the tortious conduct is attributable to any defendant against whom an intentional tort claim has been alleged and established, that defendant shall be jointly and severally liable in tort for all compensatory damages that represent economic loss.*

(4) If division (A)(3) of this section is applicable, each defendant against whom an intentional tort claim has not been alleged and established, who is determined by the trier of fact to be legally responsible for the same injury or loss to person or property or the same wrongful death, and to whom fifty per cent or less of the tortious conduct is attributable shall be liable to the plaintiff only for that defendant's proportionate share of the compensatory damages that represent economic loss. The proportionate share of a defendant shall be calculated by multiplying the total amount of the economic damages awarded to the plaintiff by the percentage of tortious conduct as determined pursuant to section 2307.23 of the Revised Code that is attributable to that defendant.

(Emphasis added.)

**{¶47}** Nissan has failed to cite the statue at all. Further, it has not argued that the trial court could not have concluded, pursuant to the statute, that Nissan fell within R.C. 2307.22(A)(3), thereby allowing the trial court to make a finding of joint and several liability. *See Gurry v. C.P.,* 8th Dist. Cuyahoga No. 97815, 2012-Ohio-2640, ¶ 9 ("With the passage of R.C. 2307.22, the Ohio legislature established that in a tort action where more than one tortfeasor has proximately caused a person's property damage, any tortfeasor who has caused fifty percent or less of the tortious conduct is responsible for only his or her proportional share of the economic loss. R.C. 2307.22(A)(2). However, in a tort action where the tortfeasors have engaged in an intentional tort, joint and several liability applies regardless of the percentage of

any tortfeasor's liability. R.C. 2307.22(A)(3).") We are not inclined to develop an argument on Nissan's behalf. In light of Nissan's limited argument, in which it fails to explain what relief it is entitled to or to cite to, or analyze, the appropriate statute, we cannot conclude that Nissan has demonstrated error on the part of the trial court. *See* App.R. 16(A)(7), (8). Nissan's third assignment of error is overruled.

## ASSIGNMENT OF ERROR IV

THE TRIAL COURT'S JUDGMENT FINDING [NISSAN] WAS LIABLE FOR [MR.] TROGDON'S ATTORNEY FEES WAS CONTRARY TO LAW.

**{¶48}** Nissan argues in its fourth assignment of error that the trial court erred in awarding attorney fees to Mr. Trogdon. Specifically, Nissan argues that, because the trial court did not award punitive damages or make a finding of bad faith, the trial court could not award attorney fees.

**{¶49}** From Mr. Trogdon's post trial brief, it appears that he sought an award of attorney fees based upon an award of punitive damages. Mr. Trogdon did not mention bad faith or that the damages could be independently awarded based upon a judgment for conversion. In Nissan's brief filed the day of the hearing on attorney fees, Nissan maintained that Mr. Trogdon could not be awarded attorney fees in the absence of a finding of bad faith or an award of punitive damages.

**{¶50}** "Ohio has long adhered to the 'American rule' with respect to recovery of attorney fees: a prevailing party in a civil action may not recover attorney fees as a part of the costs of litigation." (Citations omitted.) *Schiavoni v. Roy,* 9th Dist. Medina No. 11CA0108-M, 2012-Ohio-4435, ¶ 31. "However, there are exceptions to this rule. Attorney fees may be awarded when a statute or an enforceable contract specifically provides for the losing party to pay the prevailing party's attorney fees [] or when the prevailing party demonstrates bad faith on

the part of the unsuccessful litigant[.]" (Citations omitted.) *Id.* "They may also be awarded as an element of compensatory damages if punitive damages are awarded." (Citation omitted.) *Id.*

**{¶51}** Here, the trial court, in entering judgment, did not award punitive damages and did not mention bad faith or make any finding that would indicate there was conduct that amounted to bad faith. *See Pegan v. Crawmer,* 79 Ohio St.3d 155, 156 (1997). Instead, the trial court merely stated that, "to make [Mr. Trogdon] whole under the circumstances, [Mr. Trogdon] is entitled to an award of reasonable attorney fees." Neither side has pointed to a statute or contract that would authorize an award of attorney fees. Nonetheless, Mr. Trogdon asserts that certain case law allows for the recovery of attorney fees in conversion actions. Mr. Trogdon points to *Fulks v. Fulks,* 95 Ohio App. 515 (4th Dist.1953) and its progeny.

**{¶52}** In *Fulks,* the court differentiated between attorney fees expended in the prosecution of an action and attorney fees expended in recovering possession of converted property. *Id.* at 520. The court concluded that attorney fees expended in recovering possession of converted property were recoverable as special damages, even absent an award of punitive damages. *Id*. at 520. However, it determined that attorney fees incurred in the prosecution of the action were not properly recoverable. *Id.* In *Fulks,* the attorney fees awarded were those fees expended in actually repossessing the plaintiff's steer; the plaintiff was not awarded the attorney fees that were incurred in prosecuting the action. *See id.* at 516, 520. Mr. Trogdon points to language in *Fulks* that states, "[a]ttorney fees incurred by the plaintiff in the prosecution of this action are not recoverable *since the plaintiff is not seeking punitive damages*[,]" as evidencing that, because he sought punitive damages (but did not recover them), he should be able to recover his attorney fees in litigating the action. (Emphasis added.) *Id.* at 520. We are not convinced that the language quoted above, which is dicta, alters the general rule that attorney

fees are not recoverable as compensatory damages absent *an award* of punitive damages. *See Schiavoni* at ¶ 31.

**{¶53}** Here, while Mr. Trogdon sought to regain possession of the Jeep, ultimately he was not awarded possession in the instant litigation. Neither did he prevail on his claim for punitive damages. Accordingly, Mr. Trogdon has failed to demonstrate that *Fulks* applies to his situation, even assuming we would adopt its analysis.

**{¶54}** Accordingly, given the circumstances before us, we can only conclude that no exception to the American Rule applies, and the trial court committed reversible error in awarding attorney fees to Mr. Trogdon. Nissan's fourth assignment of error is sustained.

## ASSIGNMENT OF ERROR V

THE TRIAL COURT'S JUDGMENT FINDING [NISSAN] WAS LIABLE TO PAY [MR.] TROGDON'S ATTORNEY FEES IN THE AMOUNT OF $57,319.50 WAS AN ABUSE OF DISCRETION.

**{¶55}** Nissan argues in its fifth assignment of error that the trial court abused its discretion in awarding Mr. Trogdon $57,319.50 in attorney fees. Because we have determined above that the trial court's findings do not support an award of attorney fees in any amount, this assignment of error has been rendered moot and we decline to address it. *See* App.R. 12(A)(1)(c).

IV.

**{¶56}** Nissan's fourth assignment of error is sustained, rendering its fifth assignment of error moot. Nissan's first through third assignments of error are overruled. The judgment of the Lorain County Court of Common Pleas is affirmed in part and reversed in part. The matter is remanded for proceedings consistent with this opinion.

Judgment affirmed in part,
reversed in part,
and cause remanded.

———

There were reasonable grounds for this appeal.

We order that a special mandate issue out of this Court, directing the Court of Common Pleas, County of Lorain, State of Ohio, to carry this judgment into execution. A certified copy of this journal entry shall constitute the mandate, pursuant to App.R. 27.

Immediately upon the filing hereof, this document shall constitute the journal entry of judgment, and it shall be file stamped by the Clerk of the Court of Appeals at which time the period for review shall begin to run. App.R. 22(C). The Clerk of the Court of Appeals is instructed to mail a notice of entry of this judgment to the parties and to make a notation of the mailing in the docket, pursuant to App.R. 30.

Costs taxed equally to both parties.

CARLA MOORE
FOR THE COURT

HENSAL, J.
SCHAFER, J.
CONCUR.

APPEARANCES:

JOHN S. HAYNES, Attorney at Law, for Appellant.

CHRISTOPHER G. THOMARIOS, Attorney at Law, for Appellee.

MATTHEW A. DOOLEY, Attorney at Law, for Appellee.