[Cite as *Dyer v. Dalton*, 2019-Ohio-602.]

| STATE OF OHIO | ) | IN THE COURT OF APPEALS |
|---|---|---|
| | )ss: | NINTH JUDICIAL DISTRICT |
| COUNTY OF SUMMIT | ) | |

MELODY DYER

    Appellant

    v.

ARTHUR DALTON, M.D., et al.

    Appellees

C.A. No.     28892

APPEAL FROM JUDGMENT
ENTERED IN THE
COURT OF COMMON PLEAS
COUNTY OF SUMMIT, OHIO
CASE No.    CV-2016-07-3010

DECISION AND JOURNAL ENTRY

Dated: February 20, 2019

CARR, Presiding Judge.

{¶1} Plaintiff-Appellant Melody Dyer appeals from the judgment of the Summit County Court of Common Pleas. This Court affirms.

I.

{¶2} During late 2012 and early 2013, Ms. Dyer experienced abdominal pain, the characteristics of which raised concerns of gallbladder disease. Ms. Dyer underwent testing which indicated abnormal functioning of her gallbladder. She was referred to general surgeon, Defendant-Appellee Arthur Dalton, M.D., whom she saw on January 31, 2013 for a possible cholecystectomy, or gallbladder removal. Dr. Dalton took a history from Ms. Dyer and examined her. Dr. Dalton discussed the risks and benefits of a cholecystectomy with Ms. Dyer.

{¶3} The next day, Dr. Dalton performed a laparoscopic cholecystectomy on Ms. Dyer. Dr. Dalton described it as "seemingly a very routine-type of case." Ms. Dyer was released that same day. However, Ms. Dyer was readmitted to the hospital the next day complaining of left-

sided chest pain, nausea, and vomiting. Ms. Dyer was released a few days later. Nonetheless she continued to experience intermittent pain and other problems. Ms. Dyer returned to the hospital several times over the next few months and had multiple procedures performed to determine the source of the complications. Ultimately, a bile leak, caused by a bile duct injury, was discovered. Several months after her original surgery, Ms. Dyer underwent another surgery during which a loop of bowel was used as a conduit to drain the bile from the area of the leak to the intestinal tract. Notwithstanding the repair, Ms. Dyer has continued to suffer complications and has endured numerous other procedures.

{¶4} In 2014, Ms. Dyer filed a medical malpractice complaint naming Dr. Dalton and Defendant-Appellee Dalton and Van Fossen Surgeons, Inc. as defendants. Ms. Dyer subsequently voluntarily dismissed the action without prejudice. In July 2016, Ms. Dyer re-filed her complaint and added Ramakrishna Bandi, M.D. as a Defendant.

{¶5} The matter proceeded to a jury trial, at the conclusion of which, the jury found for Dr. Dalton and Dalton and Van Fossen Surgeons, Inc. The jury specifically found that Ms. Dyer had failed to prove that Dr. Dalton was negligent. The trial court entered judgment for the Defendants. Ms. Dyer filed a motion for a new trial, which was ultimately denied. Ms. Dyer has appealed, raising a single assignment of error for our review.

II.

**ASSIGNMENT OF ERROR**

THE JURY'S VERDICT WAS AGAINST THE MANIFEST WEIGHT OF THE
EVIDENCE.

{¶6} In her sole assignment of error, Ms. Dyer argues that the jury's verdict is against the manifest weight of the evidence. Specifically, she argues that the jury's conclusion that Dr.

Dalton was not negligent in performing the laparoscopic cholecystectomy is against the weight of the evidence. Ms. Dyer has not challenged the ruling on her motion for a new trial.

{¶7} In reviewing a manifest weight challenge, "[t]he [reviewing] court * * * weighs the evidence and all reasonable inferences, considers the credibility of witnesses and determines whether in resolving conflicts in the evidence, the [finder of fact] clearly lost its way and created such a manifest miscarriage of justice that the [judgment] must be reversed and a new trial ordered." (Internal quotations and citations omitted.) *Eastley v. Volkman*, 132 Ohio St.3d 328, 2012-Ohio-2179, ¶ 20. In so doing, "the court of appeals must always be mindful of the presumption in favor of the finder of fact." *Id.* at ¶ 21.

{¶8} "In order to prove medical malpractice, the plaintiff has the burden to prove, by a preponderance of the evidence, that the defendant breached the standard of care owed to the plaintiff and that the breach proximately caused an injury." *Segedy v. Cardiothoracic & Vascular Surgery of Akron, Inc.*, 182 Ohio App.3d 768, 2009-Ohio-2460, ¶ 11 (9th Dist.). "[M]edical negligence cases require expert testimony regarding the standard of care and proximate cause." *Callahan v. Akron Gen. Med. Ctr.*, 9th Dist. Summit No. 22387, 2005-Ohio-5103, ¶ 11.

{¶9} At trial, Ms. Dyer presented the testimony of two experts, Irvin Modlin, M.D., a surgeon who also taught at Yale University, and Garth Hadden Ballantyne, M.D., a board certified general and colorectal surgeon who also taught. Dr. Dalton presented his own testimony and that of Daniel Borreson, M.D., a board certified general surgeon. There was no debate that Dr. Dalton injured a hepatic duct; instead, the issue was whether Dr. Dalton violated the standard of care in doing so.

{¶10} We begin by noting that our review of this matter is somewhat limited in that the parties' experts and Dr. Dalton frequently pointed certain things out on diagrams and images without marking them or verbally describing what they were doing. Accordingly, while that testimony was likely clear to the jury, it is less so to this Court.

{¶11} Much of Ms. Dyer's argument centers on the concept known as the "Critical View of Safety" and whether Dr. Dalton followed it. Dr. Modlin discussed that the Critical View of Safety was developed to avoid the duct injuries that were occurring during the time period that laparoscopic surgery developed. Dr. Modlin explained that, during open procedures, which involve larger incisions, doctors could more easily see and touch the various structures, whereas with laparoscopic surgery, multiple smaller incisions are used, and the doctors view the surgical field through a telescope. Dr. Modlin opined that, now, every surgeon knows the Critical View of Safety and "everybody performs it before or during a laparoscopic operation."

{¶12} In achieving a Critical View of Safety, an area known as Calot's Triangle is dissected. According to Dr. Dalton, the borders of the triangle are made up of the cystic duct, the bottom of the liver where the gallbladder is attached, and the common bile duct. The cystic artery runs through the area of the triangle. The area of the triangle contains fatty tissue that must be cleared away so that the surgeon can locate the cystic duct and the cystic artery, which are the two structures that enter the gallbladder and are clipped and then ligated during a cholecystectomy. The goal is to clearly define the cystic duct and cystic artery so that no other structures are clipped or cut during the surgery. Dr. Modlin asserted that this area around the neck of the gallbladder, the cystic duct, and the cystic artery, must be "totally cleaned out" because "there's lots of other components here, bile ducts, right and left; common hepatic, common bile ducts; and other vessels" which could be cut "if [the surgeon does not] have a clear

view." Dr. Modlin opined that the Critical View of Safety can be obtained irrespective of any aberrations in a patient's ductal anatomy as it involves identifying the two structures entering the gallbladder: the cystic duct and the cystic artery.

{¶13} If a structure in addition to the cystic duct and artery is seen, it is not safe to proceed. If that happens, Dr. Dalton testified that he would do a cholangiogram to better discern the anatomy or convert to an open procedure.

{¶14} In the instant matter, from reviewing the records, Dr. Modlin averred that "[i]n removing the gallbladder, instead of just cutting the cystic duct, which drains the gallbladder, one of the other very large ducts was clipped, obstructed, and probably cut. As a result of that, there was a bile leakage." Specifically, Dr. Modlin opined that Ms. Dyer's right hepatic duct was clipped. Dr. Modlin concluded that Ms. Dyer's case was "about damaging a duct that shouldn't have been damaged[.]" Ultimately, Dr. Modlin's opinion was that Dr. Dalton violated the standard of care by clipping the right hepatic duct and that that breach caused Ms. Dyer's complications. Dr. Modlin stated that if the Critical View of Safety had been undertaken, "[t]he right hepatic duct or anything else would never have been damaged." He opined that this was true even if Ms. Dyer had an aberrant ductal anatomy, as alleged by Dr. Dalton and his expert, Dr. Borreson. Under Dr. Modlin's view, absent some unspecified mitigating circumstances, none of which were documented in this case, any bile duct injury during a laparoscopic cholecystectomy would be the result of surgeon negligence. Nonetheless, Dr. Modlin acknowledged on cross-examination that patients scheduled to undergo a laparoscopic cholecystectomy should be informed that the surgery carries a small risk of a bile duct injury.

{¶15} Dr. Ballantyne also opined about Dr. Dalton's care of Ms. Dyer. Dr. Ballantyne concluded that Dr. Dalton failed to meet the standard of care in performing the laparoscopic

cholecystectomy on Ms. Dyer. Dr. Ballantyne expressed concern that Dr. Dalton failed to discuss obtaining a Critical View of Safety in his operative report. In addition, Dr. Ballantyne stated that the presence of the duct injury further suggested to Dr. Ballantyne that the Critical View of Safety was not obtained. Dr. Ballantyne was also adamant that Dr. Dalton violated the standard of care even if he clipped the duct due to an aberrant variation of the duct anatomy. In Dr. Ballantyne's opinion, "part of obtaining the critical view is opening that [area] up so that there's separation and that a clip on one doesn't inadvertently clip the other." Dr. Ballantyne averred that whenever there is an injury to a bile duct in the performance of a laparoscopic cholecystectomy it speaks to negligence on the part of the surgeon. Dr. Ballantyne believed that if there is an injury to a bile duct then inherently the surgeon did not obtain a critical view. On cross-examination, Dr. Ballantyne also agreed that patients should be informed of the known risk of bile duct injury in the performance of a laparoscopic cholecystectomy.

{¶16} Dr. Dalton averred at trial that he met the standard of care in performing the surgery. When Dr. Dalton was asked if he was "confident that [he] followed [his training] and kept to the experience that [he had] in performing this surgery and getting the critical view and did the surgery according to the standard of care[,]" he responded in the affirmative. He acknowledged that informing the patient of the risks of the surgery, including a possible bile duct injury, does not absolve him of following the standard of care. He maintained that he had done "everything right" and it was "seemingly a very routine-type of case." Dr. Dalton explained that the hospital where the surgery was performed was a teaching hospital and he is responsible for teaching residents and medical students. He testified that a resident was helping in the surgery. Accordingly, the surgery was even more deliberate. Because it was a teaching hospital, Dr. Dalton indicated that "this is the opportunity that we have to explain the steps of the procedure

that we're doing.  And so we very carefully go through the anatomy.  We very carefully go through the dissection."  Dr. Dalton testified that, during surgery:

> [W]e talk about this Critical View of Safety.  We're * * * teasing [the] tissue off the lower part of the gallbladder and the cystic duct, as has been mentioned.  We tease the tissue away from the artery, as has been mentioned.  We look at the front.  We look at the back.  We look at the side.  And then, and only then, we put the clips; and then we cut.  We take the gallbladder out, pull it through one of those little holes.  That, typically, takes about an hour, which hers did.

{¶17}  He stated that he often receives high-risk gallbladder cases from other hospitals, and, as far as he knew, Ms. Dyer's duct injury was the only time he had a duct injury in his surgical career.  In reviewing the surgery, Dr. Dalton believed that Ms. Dyer had an aberrant branch of the right hepatic duct that was very close to the cystic artery and that when he clipped the cystic artery, the branch of the right hepatic duct was hidden behind it and was inadvertently clipped as well.  He thought that the duct was somehow close to, behind, or stuck to the cystic artery.  Dr. Dalton maintained that, if that was what had happened, he was not negligent.

{¶18}  In addressing his failure to mention the Critical View of Safety in the operative report, Dr. Dalton nonetheless believed his report met the standard of care.  He noted that Ms. Dyer's report was very typical of his other reports and that the Critical View of Safety was "standard" and so including it would just be "extra wordage[.]"

{¶19}  Dr. Dalton's expert, Dr. Borreson also opined that Dr. Dalton met the standard of care in performing Ms. Dyer's laparoscopic cholecystectomy.  Dr. Borreson noted that the operative report from the surgery read "like a standard cholecystectomy."  He did not fault Dr. Dalton for not mentioning the Critical View of Safety in the report as he described the operative report as a summary which does not require going into all of the details.  Dr. Borreson testified that following the technique of the Critical View of Safety does not guarantee that there will not be a bile duct injury during a laparoscopic cholecystectomy.  He indicated that, even if the

surgeon does everything properly, there can still be a bile duct injury. Dr. Borreson explained that the real surgical field is not like the diagrams where one can see all of the structures very clearly. He stated that the amount of fat in the area varies from person to person and that the surgeon has to dissect through the fat to find the relevant structures. Thus, according to Dr. Borreson, it is "a judgment call" as to how much of the fat should be dissected out. But, a surgeon does not dissect out all of the fat because "[t]hat would take hours and hours and would actually needlessly risk injury to those structures to the patient." Dr. Borreson opined that "the critical view is an attempt to identify those structures to the best of our ability." He noted that obtaining the Critical View of Safety would not always reveal an aberrant ductal anatomy in a patient.

{¶20} Dr. Borreson also believed that Ms. Dyer had an unusual anatomy of her ductal structures, which he asserted was a contributing factor to the injury of her duct. He testified that while the main bile duct was probably around a quarter of an inch in size, Ms. Dyer's aberrant right posterior hepatic duct was likely only about an eighth of an inch or about three millimeters. Thus, Dr. Borreson averred that, "even with [the] critical view, [the right posterior hepatic duct] can be misinterpreted as a cystic artery or a lymphatic or something else."

{¶21} On cross-examination, Dr. Borreson agreed that his original report reflected that the injury was to the right hepatic duct and not the right posterior hepatic duct. He also acknowledged that he was the only expert to refer to a right anterior hepatic duct and a right posterior hepatic duct. Dr. Borreson explained this, saying that he generated a report based upon the prevailing view of the anatomy at the time. However, after he issued his original report, he continued to study the case and also was provided with additional test results which caused him to alter his view of the anatomy.

{¶22} On appeal, Ms. Dyer argues that Dr. Dalton's and Dr. Borreson's explanation of what occurred supports that Dr. Dalton was negligent because their explanation acknowledges that three structures were clipped or ligated during the surgery, when only two should have been. Accordingly, Ms. Dyer argues that Dr. Dalton did not obtain the Critical View of Safety. While Dr. Ballantyne was of the opinion that, if there was a duct injury, inherently the surgeon must not have obtained the Critical View of Safety, Dr. Borreson opined that obtaining the Critical View of Safety did not guarantee that a bile duct would be uninjured. Dr. Borreson instead described the Critical View of Safety as "an *attempt* to identify those structures to the best of our ability." (Emphasis added.) Dr. Borreson explained that determining how much fat to remove from the area was a judgment call. He also maintained that all of the fat was not removed from the area. Dr. Modlin on the other hand asserted that the area had to be "totally cleaned out[.]" While Dr. Ballantyne was of the opinion that any injury to a bile duct during a laparoscopic surgery was a result of surgeon negligence, Dr. Borreson clearly did not share that view. Thus, from this Court's reading of the transcript, the experts had differing views of what obtaining a Critical View of Safety even meant. The record is also clear that while Dr. Modlin and Dr. Ballantyne did not believe that Dr. Dalton met the standard of care in performing the laparoscopic cholecystectomy, Dr. Borreson opined that Dr. Dalton did.

{¶23} While this Court is not unsympathetic to Ms. Dyer's situation or the injuries she unfortunately suffered, after a thorough and independent review of the record, we cannot say that the jury lost its way in finding that Dr. Dalton was not negligent in the performance of the laparoscopic cholecystectomy. While there was evidence from which the jury could have found in Ms. Dyer's favor, there was also evidence to support the verdict. We are mindful that during the testimony, the experts and Dr. Dalton pointed out anatomical structures while testifying

which may have influenced the jury's opinions of credibility. Because of the manner in which that testimony unfolded (by gesturing and pointing), we are unable to fully evaluate that testimony and its impact on credibility determinations. In addition, it is well settled that "the trier of fact is in the best position to determine the credibility of witnesses and evaluate their testimony accordingly." (Internal quotations and citations omitted.) *Trogdon v. Beltran*, 9th Dist. Lorain No. 15CA010809, 2016-Ohio-5285, ¶ 42. Given all of the foregoing, we can only conclude that the jury's verdict was not against the manifest weight of the evidence.

**{¶24}** Ms. Dyer's assignment of error is overruled.

III.

**{¶25}** Ms. Dyer's assignment of error is overruled. The judgment of the Summit County Court of Common Pleas is affirmed.

Judgment affirmed.

————

There were reasonable grounds for this appeal.

We order that a special mandate issue out of this Court, directing the Court of Common Pleas, County of Summit, State of Ohio, to carry this judgment into execution. A certified copy of this journal entry shall constitute the mandate, pursuant to App.R. 27.

Immediately upon the filing hereof, this document shall constitute the journal entry of judgment, and it shall be file stamped by the Clerk of the Court of Appeals at which time the period for review shall begin to run. App.R. 22(C). The Clerk of the Court of Appeals is instructed to mail a notice of entry of this judgment to the parties and to make a notation of the mailing in the docket, pursuant to App.R. 30.

Costs taxed to Appellant.

DONNA J. CARR
FOR THE COURT

HENSAL, J.
CALLAHAN, J.
CONCUR.

APPEARANCES:

GARY T. MANTKOWSKI, Attorney at Law, for Appellant.

R. MARK JONES, TAMMI J. LEES, and STEPHEN W. FUNK, Attorneys at Law, for Appellees.